# UNITED STATES *v.* INTERSTATE COMMERCE COMMISSION ET AL.

No. 28.   Argued October 21, 1969—Decided February 2, 1970*

---

*Together with No. 38, *Brundage et al.* v. *United States et al.*, No. 43, *City of Auburn* v. *United States et al.*, and No. 44, *Livingston Anti-Merger Committee* v. *Interstate Commerce Commission et al.*, on appeal from the same court.

492

*Assistant Attorney General McLaren* argued the cause for the United States. With him on the briefs were *Solicitor General Griswold, Deputy Solicitor General Springer,* and *Howard E. Shapiro. Louis B. Dailey* argued the cause for appellants in No. 38. With him on the briefs was *Harry Tyson Carter. Valentine B. Deale* argued the cause and filed briefs for appellant in No. 44. *Robert L. Wald* and *Joel E. Hoffman* filed a brief for appellant in No. 43.

*Fritz R. Kahn* argued the cause for appellee Interstate Commerce Commission in all cases. With him on the brief were *Robert W. Ginnane* and *Jerome Nelson. Hugh B. Cox* argued the cause for appellees Great Northern Railway Co. et al. in all cases. With him on the briefs were *Ray Garrett, D. Robert Thomas, Lee B. McTurnan, Michael Boudin, Anthony Kane, Louis E. Torinus, Earl F. Requa, Frank S. Farrell, Eldon Martin, R. T. Cubbage,* and *Richard J. Flynn. Fred H. Tolan*

argued the cause for appellees Pacific Northwest Shippers in No. 28. With him on the brief was *Alan F. Wohlstetter.* *Raymond K. Merrill* argued the cause for appellee Chicago, Milwaukee, St. Paul & Pacific Railroad Co. in No. 28. With him on the brief were *Edwin O. Schiewe, Warren H. Ploeger, Thomas H. Ploss,* and *Edward H. Foley. Lee Johnson,* Attorney General of Oregon, and *Richard W. Sabin,* Assistant Attorney General, filed a brief for appellee Public Utility Commissioner of Oregon in No. 28.

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

The Interstate Commerce Commission orders that give rise to these appeals grow out of applications seeking approval of a merger plan filed by the Great Northern Railway Company and the Northern Pacific Railway Company (collectively the Northern Lines), and three of their subsidiaries—the Pacific Coast Railroad Company, the Chicago, Burlington & Quincy Railroad Company (Burlington), and the Spokane, Portland & Seattle Railway Company (SP&S). The Commission approved the merger and a three-judge Federal District Court for the District of Columbia affirmed the orders of the Commission.[1] We affirm the judgment of the District Court.

The factual and historical setting of the merger is important to an understanding of our disposition of these appeals. Great Northern operates some 8,200 miles of road located in 10 States and two Canadian provinces. Northern Pacific has approximately 6,200 miles of track in seven States and one Canadian province. The Northern Lines operate largely in the area west of St. Paul, Minneapolis, and Duluth, running from these points

---

[1] The three-judge court decision is reported as *United States* v. *United States,* 296 F. Supp. 853 (D. C. D. C. 1968).

across the Northern Tier of States (Minnesota, North
Dakota, Montana, Idaho, and Washington) to Spokane,
Tacoma, and Portland. The Northern Pacific's tracks
run generally somewhat to the south of the Great North-
ern's. The Northern Lines jointly own and control the
Burlington and the SP&S, while the Great Northern
owns and controls the Pacific Coast Railroad Company.
The Burlington's 8,648 miles of track extend from Chi-
cago to the Twin Cities and generally southwesterly to
Missouri, Kansas, Colorado, and Montana. By its sub-
sidiaries [2] the Burlington reaches the Gulf of Mexico at
Houston and Galveston. The SP&S has 599 miles of
road in Oregon and Washington, of which 515 are main-
line. This mainline provides the most direct route from
Spokane to Portland and is of strategic importance to
the Northern Lines because Spokane lies on their main
transcontinental routes and Portland is an important
West Coast terminal for both roads. The Pacific Coast
has 32 miles of track, all in King County, Washington;
its rolling stock and motive power are leased from the
Great Northern.

Rail competition in the areas served by the Northern
Lines is principally between three carriers: the Great
Northern, the Northern Pacific, and the Chicago, Mil-
waukee, St. Paul & Pacific Railroad Company (Mil-
waukee). Because the Burlington's routes largely com-
plement those of the Northern Lines, there is no
substantial competition between the Burlington and its
corporate parents. The Great Northern and the North-
ern Pacific overshadow the Milwaukee and are each the
principal competitor of the other. The Northern Lines
carry the lion's share of traffic between the Twin Cities

---

[2] The Colorado & Southern Railway Company and the Fort
Worth & Denver Railway Company are both controlled by the
Burlington.

and Duluth and the Pacific Northwest, both roads having good access to the Pacific Northwest through control of certain vital gateways in the area. Although the Milwaukee was designed and constructed to be a competitor of the Northern Lines, it has never accounted for a large percentage of the carriage across the Northern Tier States to the Pacific Northwest; it has never become a rate-making railroad. The explanation for this is that although possessing superior grades and a shorter route west of the Twin Cities, it has never had adequate access to the gateways of the Pacific Northwest, largely because of the Northern Lines' control of the SP&S. As a result, its role has been that of a short-haul carrier feeding much profitable long-haul traffic to the Northern Lines at St. Paul and Minneapolis.

The population of the Northern Tier region traversed by the Northern Lines and the Milwaukee is concentrated largely in its easterly and westerly extremities. The Northern Tier is rich in agricultural and mineral resources, and embraces the country's richest timber reserves. However, the markets for the products of the Northern Tier are limited in number and distant from the region; the major shipments must move east. Thus, transportation capable of carrying its bulk products at a rate low enough to permit participation in those markets is of extreme importance to the region. Rail transportation well serves this need. There has been historically, however, an imbalance between the low-rated agricultural, mineral, and forest produce traffic flowing out of the region, and high-rated manufactured goods flowing into the region. The former is traffic inherently suited to rail transport, but the latter is subject to incursions from other modes of carriage. Although water traffic in the Northern Tier is virtually nonexistent, truck competition has been present for some time and is growing.

Northern Pacific and Great Northern have long sought to merge into a single unified transportation system. In *Pearsall* v. *Great Northern R. Co.*, 161 U. S. 646 (1896), this Court ruled that an attempt to consolidate the operation of the two roads was contrary to a Minnesota statute prohibiting the consolidation of parallel and competing railroads. The next merger attempt was struck down in *Northern Securities Co.* v. *United States*, 193 U. S. 197 (1904), as contrary to the Sherman Act, 26 Stat. 209, 15 U. S. C. § 1 *et seq.*[3] Then the declining fortunes of rail carriers led Congress to enact the Transportation Act of 1920, 41 Stat. 456, which charged the Interstate Commerce Commission with the affirmative responsibility to formulate plans for simplifying the Nation's rail transport "into a limited number of systems." 41 Stat. 481. This engendered a third effort, under the Commission's auspices, to merge the Northern Lines.[4] However, this effort foundered on the Commission's requirement that the Burlington be excluded from the Northern Lines system, and the Northern Lines were unwilling to consolidate without the Burlington.

I

The Present Merger

In 1955 the Northern Lines began investigating anew the possibility of a merger that would combine five roads—the Burlington, the SP&S, the Pacific Coast, and the Northern Lines—to form a New Company. Extensive negotiations dealing with all phases of the proposed merger were commenced. Five years later, in 1960, an agreement was finally reached. It provided that the Northern Lines, the Burlington, and the Pacific Coast

---

[3] The vote in this historic case was 5 to 4 with one of the majority, Mr. Justice Brewer, joining on narrower grounds.

[4] See *Great Northern Pacific R. Co. Acquisition*, 162 I. C. C. 37 (1930).

be merged into New Company, which was to acquire the subsidiaries of the merged companies as well as all their leasehold, trackage, and joint-use rights in other carriers and the terminals incident thereto. New Company would lease the SP&S, thereby acquiring that road's subsidiaries and trackage rights.

The merger agreement further provided that Northern Pacific shareholders would receive common stock of New Company on a share-for-share basis. Great Northern stockholders would receive one share of New Company common for each share of Great Northern and, in addition, one-half share of New Company $10 par 5½% preferred for each share of Great Northern held at the date of the merger, this preferred stock to be retired over a 25-year period, beginning at the fifth anniversary of the merger, and to be redeemable at the option of New Company any time after the fifth anniversary of the merger. The Burlington stock held by the Northern Lines, amounting to 97.18% of the total shares outstanding, would be canceled and the remaining shareholders given 3.25 shares of New Company common for each share of Burlington.

## Commission Proceedings

*First Report.*—As a result of these renewed merger negotiations between 1955 and 1960, applications were filed in 1961 under § 5 of the Interstate Commerce Act, 24 Stat. 380, as amended, 49 U. S. C. § 5, seeking approval of the merger and authorization for the issuance of stock and securities, the assumption of obligations and other authority necessary to effectuate the merger.[5] Extensive public hearings were held in 1961 and 1962 at

---

[5] Among the allied transactions were the issuance of certain securities and the assumption of obligations and liability in respect of securities under § 20a of the Interstate Commerce Act, and the obtaining of certain extensions and abandonments of railroad lines under §§ 1 (18) to 1 (20), inclusive, of the Act.

which the Department of Justice, the Department of Agriculture, various railway employee groups, nine States or state regulatory agencies, and the Milwaukee and the Chicago & North Western Railway Company (North Western), *inter alia,* actively opposed the merger as proposed. Shippers and related interest groups appeared in support of the proposal. The Hearing Examiner submitted a report in 1964 recommending approval of the merger and the related transactions, subject to certain protective conditions. The Commission heard oral argument and in a report dated March 31, 1966 (First Report), rejected the Examiner's recommendation and disapproved the merger by a vote of 6 to 5.[6]

The applicants petitioned for a reconsideration, asserting that they were willing to accept all protective conditions sought by the Milwaukee and another affected road, the North Western, that they had entered into attrition agreements with the objecting unions for the protection of the employees, and that the merger would yield dollar savings greater than those estimated in the First Report. While this petition was pending before the Commission, the applicants entered into agreements with the North Western and the Milwaukee which provided that the merger applicants would agree to all the conditions sought by those roads; the Milwaukee and the North Western then agreed to support the merger.[7] Thereafter, these roads withdrew their opposition to the merger and urged the Commission to approve it. Approval was advocated or objections withdrawn by a number of parties who had previously either completely opposed the merger or opposed it absent imposition of

---

[6] 328 I. C. C. 460 (1966). The majority included Commissioners Bush, Tucker, Webb, Tierney, Brown, and Deason. Commissioners Tuggle, Freas, Murphy, Walrath, and Goff dissented.

[7] The Northern Lines also agreed not to oppose the authorization of a proposed Milwaukee-North Western merger.

adequate protective conditions. These included the Department of Agriculture, the Public Utility Commissioner of Oregon, and the States of North Dakota, South Dakota, Iowa, Wisconsin, and Michigan.[8]

*Second Report.*—On January 4, 1967, the Commission granted the application and reopened the proceedings for reconsideration and further hearings. Although the order by its terms reopened the proceedings on all issues, the hearing was limited to taking evidence on the question of the amount of savings the merger would produce in light of the agreement between the applicants and the Milwaukee and the North Western, and the other changes relevant to savings which had occurred after the close of the first hearing. Oral arguments followed. On November 30, 1967, the Commission handed down a report and order (Second Report) approving the proposed merger by a vote of 8 to 2 as consistent with the public interest and imposing certain conditions to protect other carriers.[9] On April 11, 1968, the Commission denied an application for reconsideration.[10]

---

[8] Petitions were also filed by the Northern Pacific Stockholders' Protective Committee seeking further hearings with respect to the justness and reasonableness of the terms of the merger agreement, and the Denver & Rio Grande Railroad seeking an investigation into the agreements entered into by the applicants with the Milwaukee and the North Western. These petitions were denied.

[9] 331 I. C. C. 228 (1967). Commissioners Tuggle, Murphy, Walrath, Bush, Tucker, Deason, Stafford, and Syphers voted to approve the merger, while Commissioners Tierney and Brown dissented. Commissioner Hardin did not participate in the decision.

[10] In this order the Commission modified one of the conditions placed on the merger by the order of November 30, 1967. On June 17, 1968, a further order was issued, ruling that the Milwaukee must be allowed to bring grain traffic through 11 gateways opened to it by conditions contained in the Second Report. Neither the order of April 11 nor that of June 17 was challenged in the District Court. Hence, they are not before us.

### District Court Proceedings

The United States, acting through the Department of Justice, filed a complaint on May 9, 1968, in the United States District Court for the District of Columbia challenging the Commission order approving the merger. Other parties intervened, some as plaintiffs [11] and some as defendants.[12] After preliminary proceedings had resulted in a stay of the Commission's order *pendente lite,* the case was submitted on the merits to the three-judge court designated in accordance with 28 U. S. C. §§ 2325 and 2284. The court, in an opinion by Senior Circuit Judge Charles Fahy, unanimously sustained the Commission, holding that in approving the merger and the related transactions the Commission was guided by the applicable legal principles and that its findings were supported by substantial evidence. The court dismissed the complaints, vacated the stay *pendente lite,* and then stayed its order pending appeal to this Court. Upon the filing of appeals with this Court, we ordered a further stay pending final disposition.

## II

### The Appeals Here

Four appeals were taken from the District Court's judgment; the Department of Justice (No. 28), the Northern Pacific Stockholders' Protective Committee

---

[11] Attacking the merger were the following: the Northern Pacific Stockholders' Protective Committee; the City of Auburn, Washington; the State of Washington; the Board of Railroad Commissioners of Montana; the Livingston Anti-Merger Committee; and the Public Service Commission of Minnesota.

[12] The intervening defendants included the applicants, the Milwaukee, the Public Utility Commissioner of Oregon, and 230 Pacific Northwest shippers.

(No. 38), the City of Auburn, Washington (No. 43), and the Livingston Anti-Merger Committee (No. 44).

Each of the four appellants attacks the approval of the merger on different grounds. Because these challenges cover every aspect of the merger, and because of the rather complex expositions of fact necessary to the disposition of each objection, these appeals will be dealt with *seriatim*. With the cases in this posture the Court must review the proceedings before the Commission to "determine whether the Commission has proceeded in accordance with law and whether its findings and conclusions accord with the statutory standards and are supported by substantial evidence." *Penn-Central Merger and N&W Inclusion Cases*, 389 U. S. 486, 499 (1968). It should be emphasized, however, as Mr. Justice Fortas noted, speaking for the Court in a similar context, "[w]ith respect to the merits of the merger . . . our task is limited. We do not inquire whether the merger satisfies our own conception of the public interest. Determination of the factors relevant to the public interest is entrusted by the law primarily to the Commission, subject to the standards of the governing statute." *Id.*, at 498–499.

The governing statute here is § 5 of the Interstate Commerce Act, as amended by the Transportation Act of 1940, 54 Stat. 905, 49 U. S. C. § 5. The Act provides that the Commission is to approve a proposed merger when it is "consistent with the public interest" and the terms of the proposal are "just and reasonable." In determining whether this standard is met, the Commission is to

> "give weight to the following considerations, among others: (1) The effect of the proposed transaction upon adequate transportation service to the public; (2) the effect upon the public interest of the inclusion, or failure to include, other railroads

in the territory involved in the proposed transaction; (3) the total fixed charges resulting from the proposed transaction; and (4) the interest of the carrier employees affected." 49 U. S. C. § 5 (2)(c).

In addition to the four factors listed above, the Commission must also consider the anticompetitive effects of any merger or consolidation, because under § 5 (11) of the Interstate Commerce Act any transaction approved by the Commission is relieved of the operation of the antitrust laws. *McLean Trucking Co.* v. *United States*, 321 U. S. 67, 83–87 (1944).

In its First Report the Commission found that the merger would result in improved service to shippers in areas served by the Northern Lines because it would enable the roads to make more efficient use of their facilities and would permit the use of the shortest and swiftest internal routes available. In addition, the merger was found to afford estimated savings of approximately $25 million per year by the tenth year after merger. However, the Commission also found that as a consequence of the merger more than 5,200 jobs would be eliminated, this being a significant source of the reduced operating costs. The Commission then analyzed the anticompetitive impact of the proposal and found it would eliminate substantial competition between the Northern Lines in the Northern Tier. The Commission reasoned that even with protective conditions attached to the merger for the benefit of the Milwaukee, it would remain a weak carrier in the Northern Tier when compared with New Company. The Commission, by a vote of 6 to 5, as noted earlier, concluded that the proposed merger plan did not afford benefits of such scope and importance as to outweigh the lessening of rail competition in the Northern Tier; the merger was disapproved.

When the Commission reopened the proceedings in

1967, it considered additional evidence including the changed positions of some of the major objectors, and new evidence on the savings to be realized from the merger; the Second Report was then issued. The Commission found that rather than the $25 million previously estimated, in fact more than $40 million per year in savings would be realized by the tenth year after merger. It also noted that agreements entered into by the applicants and their employees had removed objections of various unions to the merger and that no jobs would be eliminated except in the normal course of attrition. Aside from these changes, and the acceptance by the merger applicants of protective conditions sought by the Milwaukee, the record before the Commission was the same as that on which the First Report was based. The Second Report acknowledged that the First Report had failed to give appropriate weight to one of the aims of the national transportation policy and § 5 of the Interstate Commerce Act, to facilitate rail mergers "consistent with the public interest" in the development of a comprehensive national transport system, and that this had led the Commission to view the merger proposal too stringently. It then went on to re-examine the anticompetitive effects of the merger, weighing them against the savings and benefits to the public, shippers, and the roads, and, accentuating the new and strengthened competitive posture of the Milwaukee, it concluded that the merger proposal should be approved because its benefits outweighed its anticompetitive effects in the Northern Tier region.

That this was not an easy problem for the Commission is attested by the lengthy history of attempts to merge these lines which dates back three-quarters of a century. The efforts to establish a more unified rail transportation system in the Northern Tier represent a 20th

century phase of the development of the American West; it brackets a period of enormous growth and change, and of new developments in transportation and public needs. Against this background it is not surprising that the members of the Commission were divided 6 to 5 against the merger on the First Report in 1966 and 8 to 2 in favor of the merger on the Second Report in 1967 after changes had been made in the plan to meet many of the objections raised. Nor is it remarkable that two great departments of government, each charged with responsibility to protect the public interest, took opposing positions; vigorous advocacy of divergent views on this difficult problem has narrowed and sharpened the issues and aided the Court in their resolution, ensuring that no factor which ought to be considered would elude our attention.

### Appellants' Contentions

(a) *No. 28, Department of Justice.*—The United States, through the Antitrust Division of the Justice Department, challenges the Commission's approval of the merger primarily on the ground that the Commission in the Second Report did not properly apply the standard of § 5 (2)(b) of the Interstate Commerce Act in determining that the merger is consistent with the public interest. The Department contends that under the statute when a proposed merger will result in a substantial diminution of competition between two financially healthy, competing roads, its anticompetitive effects should preclude the approval of the merger absent a clear showing that a serious transportation need will be met or important public benefits will be provided beyond the savings and efficiencies that normally flow from a merger. The Department urges that the instant case presents a merger between two financially healthy carriers, each of which is the prime competitor of the

other in the area served. Admittedly the Commission
found in its First Report that the merger would result
in a "drastic lessening of competition." The Depart-
ment argues that because no benefits are shown to flow
from the merger beyond the economies and efficiencies
normally resulting from unified operations, the Com-
mission has not satisfied the statutory standard and that
the District Court erred in refusing to enjoin the merger.

The Department maintains that prior to 1920 the
antitrust laws and their underlying policies applied with
full force to railroads and that the Transportation Act
of 1920, which commanded an affirmative development
by the Commission of a nationwide plan "for the con-
solidation of the railway properties of the continental
United States into a limited number of systems," 41
Stat. 481, was primarily intended to promote the ab-
sorption of financially weak by strong carriers. To the
extent that the 1920 Act did not intend to encourage
rail mergers producing only the usual or "normal" kinds
of merger benefits, the Department contends that the
policies of the antitrust laws remain the guiding standard
by which these consolidations are to be judged. The
Transportation Act of 1940, according to the Depart-
ment, did not alter this policy, but only eliminated the
Commission's duty to formulate a national plan and to
confine mergers to the four corners of this plan. The
Department suggests that when the Commission is deter-
mining whether a merger or consolidation is consistent
with the public interest, it must analyze the merger in
terms of its anticompetitive impact and, if that impact
would be great, then determine whether the merger is
required by a serious transportation need or necessary
to secure important public benefits. This standard, it
urges, is "consistent with both the legislative history of
[§ 5] and, more generally, with the goal of substantial

simplification of railroad systems that underlay the Transportation Acts of both 1920 and 1940." [13]

The Department of Justice is correct in stating that one focal point of concern throughout the legislative consideration of the problems of railroads has been the weak carrier and its preservation through combination with the strong. Congress saw that as one—but only one—means to promote its objectives. The 1920 statute as a whole also embodied concern for economy and efficiency in rail operations. See *Railroad Commission of California* v. *Southern Pacific Co.*, 264 U. S. 331, 341 (1924); *Texas & Pacific R. Co.* v. *Gulf, Colorado & Santa Fe R. Co.*, 270 U. S. 266, 277 (1926); *Texas* v. *United States*, 292 U. S. 522, 530 (1934); *United States* v. *Lowden,* 308 U. S. 225, 232 (1939). Thus, a rail merger that furthers the development of a more efficient transportation unit and one that results in the joining of a "sick" with a strong carrier serve equally to promote the long-range objectives of Congress and, upon approval by the Commission, both are immunized from the oper-

---

[13] We might note that the substance of the Department's position with respect to the Commission's power to approve consolidations was presented to this Court by the Secretary of Agriculture in No. 31, O. T. 1943, *McLean Trucking Co.* v. *United States,* 321 U. S. 67 (1944), Brief for Secretary of Agriculture of the United States 38, 40, and to the three-judge court in the Seaboard-Coast Line merger litigation, *Florida East Coast R. Co.* v. *United States,* 259 F. Supp. 993, 1012–1013 (D. C. M. D. Fla. 1966), aff'd *per curiam,* 386 U. S. 544 (1967). In both of these cases, one decided in 1944 and the other in 1966, the Department's position was rejected. In addition, in 1962 a bill was before the Senate that would have imposed a moratorium on the Commission's approval of large railroad mergers that would otherwise violate § 7 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 18. The Department actively supported the bill. It was not reported out of committee. See Hearings on S. 3097 before the Subcommittee on Antitrust and Monopoly of the Senate Committee on the Judiciary, 87th Cong., 2d Sess. (1962).

ation of the antitrust laws. The policy of the 1920 Act has been consistently interpreted in this way. We find no basis for reading the congressional objective as confining these mergers to combinations by which the strong rescue the halt and the lame.

In *New York Central Securities Corp.* v. *United States,* 287 U. S. 12 (1932), this Court cautioned that

> "[t]he fact that the carriers' lines are parallel and competing cannot be deemed to affect the validity of the authority conferred upon the Commission. . . . The question whether the acquisition of control in the case of competing carriers will aid in preventing an injurious waste and in securing more efficient transportation service is thus committed to the judgment of the administrative agency upon the facts developed in the particular case." *Id.,* at 25–26.

Although this decision was prior to the passage of the Transportation Act of 1940, that Act in no way altered the basic policy [14] underlying the 1920 enactment. We recognized in *St. Joe Paper Co.* v. *Atlantic Coast Line R. Co.,* 347 U. S. 298, 319 (1954), that Congress adopted the recommendations of the Committee of Six when it passed the 1940 Transportation Act and relieved the Commission of its duty to promulgate a national railroad consolidation plan. That Committee's report recognized economies and efficiencies of operation as well as the elimination of circuitous routing to be benefits that could

---

[14] The Commission apparently had no difficulty in approving a merger of the Northern Lines under a plan similar to that held violative of the Sherman Act in *Northern Securities Co.* v. *United States,* 193 U. S. 197 (1904). The Commission gave as one of the considerations leading it to approve the proposed merger, "the feasibility of making large operating economies." *Great Northern Pacific R. Co. Acquisition,* 162 I. C. C. 37, 47 (1930).

flow to the public through consolidations.[15]   As recently as *County of Marin* v. *United States,* 356 U. S. 412 (1958), this Court observed:

> "The congressional purpose in the sweeping revision of § 5 of the Interstate Commerce Act in 1940 . . . was to facilitate merger and consolidation in the national transportation system.   In the Transportation Act of 1920 the Congress had directed the Commission itself to take the initiative in developing a plan 'for the consolidation of the railway properties of the continental United States into a limited number of systems,' 41 Stat. 481, but after 20 years of trial the approach appeared inadequate.   The Transportation Act of 1940 extended § 5 to motor and water carriers, and relieved the Commission of its responsibility to initiate the unifications.   'Instead, it authorized approval by the Commission of carrier-initiated, voluntary plans of *merger* or *consolidation* if, subject to such terms, conditions and modifications as the Commission might prescribe, the proposed transactions met with certain tests of public interest, justice and reasonableness . . . .' (Emphasis added.) *Schwabacher* v. *United States,* 334 U. S. 182, 193 (1948). . .
> In short, the result of the Act was a change in the *means,* while the *end* remained the same. The very language of the amended 'unification section' expresses clearly the desire of the Congress that the industry proceed toward an integrated na-

---

[15] Report of Committee appointed September 20, 1938, by the President of the United States, to Submit Recommendations upon the General Transportation Situation, December 23, 1938, in Hearings on H. R. 2531 before the House Committee on Interstate and Foreign Commerce, 76th Cong., 1st Sess., 259–308 (1939).

tional transportation system through substantial corporate simplification." *Id.,* at 416–418. (Emphasis in original.) (Footnotes omitted.)

We turn now to consider the appropriate weight to be accorded by the Commission to antitrust policy in proceedings for approval of a merger. The role of antitrust policy under § 5 was discussed comprehensively and dispositively in *McLean Trucking Co.* v. *United States,* 321 U. S. 67 (1944), a case dealing with a merger of several large trucking companies. Since this Court has nowhere else dealt so definitively with this issue, the analysis by Mr. Justice Rutledge in the opinion for the Court merits extended quotation:

"The history of the development of the special national transportation policy suggests, quite apart from the explicit provision of § 5 (11), that the policies of the anti-trust laws determine 'the public interest' in railroad regulation only in a qualified way. And the altered emphasis in railroad legislation on achieving an adequate, efficient, and economical system of transportation through close supervision of business operations and practices rather than through heavy reliance on the enforcement of free competition in various phases of the business, cf. *New York Central Securities Corp.* v. *United States,* 287 U. S. 12, has its counterpart in motor carrier policy. . . .

"[T]here can be little doubt that the Commission is not to measure proposals for all-rail or all-motor consolidations by the standards of the anti-trust laws. Congress authorized such consolidations because it recognized that in some circumstances they were appropriate for effectuation of the national transportation policy. It was informed that this

policy would be furthered by 'encouraging the organization of stronger units' in the motor carrier industry. And in authorizing those consolidations it did not import the general policies of the anti-trust laws as a measure of their permissibility. It in terms relieved participants in appropriate mergers from the requirements of those laws. § 5 (11). In doing so, it presumably took into account the fact that the business affected is subject to strict regulation and supervision, particularly with respect to rates charged the public—an effective safeguard against the evils attending monopoly, at which the Sherman Act is directed. Against this background, no other inference is possible but that, as a factor in determining the propriety of motor-carrier consolidations the preservation of competition among carriers, although still a value, is significant chiefly as it aids in the attainment of the objectives of the national transportation policy.

"Therefore, the Commission is not bound . . . to accede to the policies of the anti-trust laws . . . .

"Congress however neither has made the anti-trust laws wholly inapplicable to the transportation industry nor has authorized the Commission in passing on a proposed merger to ignore their policy. . . . Hence, the fact that the carriers participating in a properly authorized consolidation may obtain immunity from prosecution under the anti-trust laws in no sense relieves the Commission of its duty, as an administrative matter, to consider the effect of the merger on competitors and on the general competitive situation in the industry in the light of the objectives of the national transportation policy.

"In short, the Commission must estimate the scope and appraise the effects of the curtailment of competition which will result from the proposed

consolidation and consider them along with the advantages of improved service, safer operation, lower costs, etc., to determine whether the consolidation will assist in effectuating the over-all transportation policy. Resolving these considerations is a complex task which requires extensive facilities, expert judgment and considerable knowledge of the transportation industry. Congress left that task to the Commission . . . . 'The wisdom and experience of that commission,' not of the courts, must determine whether the proposed consolidation is 'consistent with the public interest.' [Citations omitted.] If the Commission did not exceed the statutory limits within which Congress confined its discretion and its findings are adequate and supported by evidence, it is not our function to upset its order." *Id.*, at 83–88. (Footnotes omitted.)

Accord, *Minneapolis & St. L. R. Co.* v. *United States,* 361 U. S. 173, 186–188 (1959); *Seaboard Air Line R. Co.* v. *United States,* 382 U. S. 154, 156–157 (1965); see *Florida East Coast R. Co.* v. *United States,* 259 F. Supp. 993 (D. C. M. D. Fla. 1966), aff'd *per curiam,* 386 U. S. 544 (1967).

The Department urges that the Commission failed to give sufficient weight to the diminution of competition between the Northern Lines—in short, that it failed to strike the correct balance between antitrust objectives and the overall transportation needs that concern Congress. This contention tends to isolate individual factors that are to enter into the Commission's decision and view them as the controlling considerations. "Competition is merely one consideration here," *Penn-Central Merger and N&W Inclusion Cases,* 389 U. S. 486, 500 (1968). And, we might add, it is a consideration that is implied and is in addition to the four specifically men-

tioned in § 5 (2)(c) of the statute. In our view the Commission, in both reports, exhibited a concern and sensitivity to the difficult task of accommodating the regulatory policy based on competition with the long-range policy of achieving carrier consolidations. Indeed, this led the Commission to disapprove the merger by a margin of one vote in 1966 after five years of study because of specified infirmities in the plan. The Commission reached a different conclusion by a decisive vote in 1967 on a supplemental record which reflected substantial changes in the merger plan. Our review, like that of the District Court, reveals substantial record evidence to support the Commission's determination that the conditions agreed to by the applicants, the attrition agreements with the employees, the enhanced savings found in the Second Report, and the service improvements to shippers and the public found in both the First and Second Reports outweighed the loss of competition between the Northern Lines. Striking the balance is for the Commission and we cannot say that it did so improperly.

The benefits to the public from this merger are important and deserve elaboration. The Commission found that substantial service benefits would flow from the merger. Shippers will benefit from improved car supply, wider routing, better loading and unloading privileges, and improved tracing and claims service. New Company will be able to use the shortest and most efficient routes while eliminating yard interchange delays, thus providing shippers with faster service. The Commission found that the economies New Company will realize as a result of consolidating yards, repair facilities, and management, eliminating duplicate train services and pooling of cars and trains will result in lower rates to shippers and receivers. In addition, the opening of strategic gateways to the Milwaukee will remove artificial barriers to

the development of new markets, sources of supply, and services.

The Milwaukee objections prior to the First Report were based on the adverse impact of the merger on its competitive position and, in turn, on shippers and the public. Following the First Report the Northern Lines accepted conditions urged by the Milwaukee. Under the new conditions the posture of the Milwaukee, lying largely between the two Northerns and handicapped by limitations at both eastern and western terminals, will be greatly improved. Absent the protective conditions it would continue to be virtually strangled by the unified system; with them the Milwaukee gives prospect of affording substantial competition to the merged lines and will be placed in the position that at its inception it hoped to achieve. Its past failure to become a meaningful competitor came in large part because its lines did not reach into Portland, Oregon, or into the southwest terminal of the Northern Lines in California. In a strictly competitive situation it is understandable that neither of the Northern Lines would interchange traffic with the Milwaukee except on its own terms and this destined that the Milwaukee would fail to become a true transcontinental line even though its western terminus lay within a few miles of Portland with the latter's access to the sea.

The Milwaukee north-south traffic on the West Coast was limited to the short run from Seattle to Longview, barely half the distance from the Canadian border to Washington's southern border. Moreover, westbound traffic destined for points on one of the Northern Lines was taken over by one of them at St. Paul or Minneapolis notwithstanding Milwaukee's line from there deep into Washington. In the proceedings prior to 1966 many objecting shippers joined the Milwaukee in pointing out that rates and limitations on Milwaukee's service

precluded full use of the Milwaukee to the disadvantage of both shippers and the carrier.

The conditions imposed by the Commission's Second Report will alter that situation and substantially enlarge the Milwaukee's competitive potential between St. Paul and Minneapolis and the West Coast due to enlargement of its long-haul capability. Shippers will be afforded more flexible service. Another condition attached to the Commission's approval will permit the Milwaukee to run lines from its present western terminus into Portland, giving it a link with the Southern Pacific. All this will enable the Milwaukee to compete with the Northern Lines for east-west traffic and some north-south traffic as well as linkage with Canadian carriers to the north, which was previously the exclusive domain of one or both of the Northerns. Other conditions of lesser consequence will buttress the newly designed competitive posture of the Milwaukee.

The contention that the Commission failed to project an analysis of the relative position of the Milwaukee *vis-à-vis* the merged Northerns discounts the difficulty of precise forecasts and tends to overstate the need for such projections. The Commission can deal only in the probabilities that will arise from the Milwaukee's improved posture as a genuine competitor for traffic over a wide area, something it had never been able to achieve. After the merger it will afford shippers a choice of routes and service negating the idea that all rail competition will disappear in the Pacific Northwest.

(b) *No. 38, The Northern Pacific Stockholders' Protective Committee.*—The Northern Pacific Stockholders' Protective Committee [16] has appealed the District Court's affirmance of the Commission's approval of the pro-

---

[16] Appellant Committee represents about 3% of Northern Pacific's stockholders, who hold approximately 5% of the outstanding shares of Northern Pacific.

posed merger's stock exchange provisions. To put each of the Committee's contentions in perspective requires that we describe the source of the Committee's concern and how the applicants dealt with it in reaching the present merger terms.

The Committee's continuing opposition to the merger relates to Northern Pacific's land holdings. The Northern Pacific Railway Company holds more than two million acres in fee and has mineral rights in another six million acres. These lands are rich in natural resources, including coal, oil, and timber, and are important sources of income. The negotiations between the parties centered to a large extent on these lands. Northern Pacific's financial adviser had suggested that although Great Northern had a better history of earning power and its stock had generally sold at a level above that of Northern Pacific's, the large land holdings of the Northern Pacific with their vast resources were of sufficient worth to justify a share-for-share exchange ratio between the Great Northern and the Northern Pacific. The Great Northern, however, insisted on a 60-40 stock exchange ratio because of its traditional rail strength. After further negotiations the roads realized that the lands were a stumbling block to the merger and considered several modes of segregating them from Northern Pacific's rail properties. One was to create two classes of New Company stock, one being issued to Northern Pacific shareholders and representing the natural resource properties, and another being issued to both Great Northern and Northern Pacific shareholders and representing Northern Pacific's rail properties. The second solution considered was spinning off the natural resource lands into another corporation and using the proceeds from an issuance of its stock as a Northern Pacific contribution to the merger. Neither of these solutions was acceptable to the negotiators, the former because of the problems inherent in

administering a corporation for two classes of stock-holders with divergent interests, and the latter because of potential litigation with bondholders and adverse tax consequences to Northern Pacific. The negotiators concluded that the merger plan must include the land holdings of Northern Pacific.

Thereafter both roads made concessions, the Great Northern abandoning its claim for a permanently larger share for its stockholders and the Northern Pacific abandoning its claim for immediate equality. The result was an exchange ratio giving immediate recognition to Great Northern's greater earning power and historically higher market price while giving Northern Pacific's shareholders equal participation in the earnings of the enterprise on a long-term basis. The terms of the merger, as worked out by the negotiators over a five-year period, were approved by both roads' financial advisors, their boards of directors and their stockholders.[17] Shortly thereafter the Northern Pacific Stockholders' Protective Committee was formed.

When the merger proposal was submitted to the Commission for approval the Stockholders' Committee opposed the exchange ratio, pressing its claim that the natural resource lands were undervalued and that the Commission either should adjust the exchange ratio in accordance with the Committee's estimates of the property's worth or, preferably, should order the lands segregated and placed in a separate corporation, the stock of

---

[17] Northern Pacific's shareholders approved the merger terms in 1961 by a vote of 73.81% to 6.64%, the remainder of the stock not being voted. In 1968 the shareholders again approved the merger's terms, as conditioned by the ICC's Second Report, 73.2% voting for and 2.57% voting against, the remainder not voting. Prior to both of these votes the members of the appellant Committee vigorously urged the shareholders to reject the merger as being unfair because of the low value given the natural resource properties.

which would be available to Northern Pacific shareholders. The Hearing Examiner's report reviewed the extensive negotiations between the parties and the modes by which they reached a valuation of the contribution each road's shareholders were making to New Company, concluding that there had been good-faith arm's-length bargaining and that the result of this bargaining fairly reflected each group of stockholders' contribution to New Company. The Examiner found the Committee's contention on value to be unsupported by record evidence and its spinoff proposal to be unfair to Northern Pacific shareholders. He recommended approval of the terms of the exchange.

The Commission's First Report, which disapproved the merger, did not reach the issue of the exchange ratio. When in 1967 the Commission reconsidered its earlier decision, it refused the Committee's request that it reopen the record for the taking of new evidence on the exchange ratio, but did hear oral argument on the matter. The Committee again pressed its contentions. The Commission's Second Report rejected the Committee's arguments upon basically the same grounds given by the Hearing Examiner in his 1964 Report.

The Committee continued its attack on the stock exchange ratio in the District Court and urged that the Commission had abused its discretion in refusing to reopen the record to receive updated evidence on the exchange ratio. The District Court ruled that the Commission's finding that the terms were just and reasonable was supported by substantial evidence. It also held that the evidence the Committee proffered was not of sufficient importance to have affected the ultimate fairness of the Commission's finding. The discretion exercised by the Commission in refusing to reopen the record was, therefore, found free from abuse.

The Committee now contends that the record lacks substantial evidence to support the Commission's determina-

tion that the exchange ratios are just and reasonable; that the Commission failed to consider the whole record before it; that the Commission erred, abused its discretion, or denied appellant due process of law in not permitting the record to be updated respecting the 1967 worth of the contributions being made by each group of shareholders, especially respecting Northern Pacific's natural resource properties; that the record does not contain substantial evidence to support the determination of the Commission that the proposed segregation of the natural resource lands is a proposal lacking merit and is unfair to Northern Pacific shareholders; and that the District Court erred in upholding the Commission's action. Our review leads us to reject these contentions.

Under § 5 (2) of the Interstate Commerce Act, the Commission is to approve only such merger terms as it finds to be just and reasonable. The Commission, as had the negotiators and the Hearing Examiner, fully considered the proposed segregation of the natural resource properties and concluded that it was neither feasible nor fair to Northern Pacific stockholders. That determination is supported by substantial record evidence. In passing we note that although the Commission in fulfilling its statutory responsibilities is to carefully review all of the terms of a merger proposal and determine whether they are just and reasonable, it is not for the agency, much less the courts, to dictate the terms of the merger agreement once this standard has been met. It can hardly be argued that the bargaining parties were not capable of protecting their own interests.

The Commission's unwillingness to reopen the record in 1967 for the taking of new evidence on the exchange ratio was not an abuse of discretion nor did it deny the appellant due process of law. What this Court said in

*Interstate Commerce Commission* v. *Jersey City,* 322 U. S. 503 (1944), is applicable here:

> "Administrative consideration of evidence—particularly where the evidence is taken by an examiner, his report submitted to the parties, and a hearing held on their exceptions to it—always creates a gap between the time the record is closed and the time the administrative decision is promulgated. This is especially true if the issues are difficult, the evidence intricate, and the consideration of the case deliberate and careful. If upon the coming down of the order litigants might demand rehearing, as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening. It has been almost a rule of necessity that rehearings were not matters of right, but were pleas to discretion. And likewise it has been considered that the discretion to be invoked was that of the body making the order, and not that of a reviewing body." *Id.,* at 514–515.

Moreover, as this Court noted in *United States* v. *Pierce Auto Freight Lines,* 327 U. S. 515 (1946), "it has been held consistently that rehearings before administrative bodies are addressed to their own discretion. . . . Only a showing of the clearest abuse of discretion could sustain an exception to that rule." *Id.,* at 535.

We find nothing in the Committee's arguments to persuade us that such an abuse occurred when the Commission refused to take further evidence on the question of each group of shareholders' contribution to the merger. *Schwabacher* v. *United States,* 334 U. S. 182 (1948), relied upon by the Committee, is not to the contrary.

That decision requires that the value of a stockholder's contribution to a merger be determined in accord with the "current worth" of his equity. That does not mean there must be a repeated updating of the evidence before the agency; in a complex merger such as this that would lead to interminable delay. A determination that the terms of a merger proposal fairly reflect the current worth of each shareholder's contribution meets the standards of *Schwabacher* if the agency had before it evidence as to the worth of the shareholders' contributions at the time of the submission of the proposal, and there is no showing that subsequent events have materially altered the worth of the various shareholders' contributions to the merger. The evidence the appellant Committee presents to this Court, purporting to show that Northern Pacific's stock is presently worth considerably more, *vis-à-vis* Great Northern's, than was the case at the time of the initial hearings, does show fluctuations in the worth of the two companies' stock. But we cannot say that those fluctuations, in the context of this merger proposal, are sufficient to show that the worth of the various shareholders' contributions to the merger has been materially altered. We agree with the District Court that the Commission's refusal to reopen the record for further evidence was not an abuse of discretion.

(c) *No. 43, City of Auburn.*—The City of Auburn, Washington, opposes the merger for the reasons set out in the brief of the Department of Justice, and, in addition, contends that the Commission failed to adequately assess the impact of the merger upon affected communities and explain why the benefits of the merger convincingly outweigh its adverse effects on these communities. Auburn also objects to the refusal to open the 1967 hearings for further testimony concerning the impact of the merger upon Auburn.

Auburn is a city of 19,000 inhabitants in western Washington, halfway between Seattle and Tacoma,

which serves as the western terminus for the Northern Pacific's transcontinental trains. A substantial part of the city's economy is dependent upon that road's activity there. The record before the Commission indicated that if the merger were approved, the Auburn yard would be closed, and that the town of Everett, on the other side of Seattle, would become the western terminus for all of New Company's transcontinental trains.

Insofar as the city challenges the Commission's action on the same grounds as the Department of Justice, our disposition of the appeal in No. 28 applies here. As for the 1967 hearings, the city failed to object to the scope of the Commission's reopened hearings and made no attempt to present evidence at those hearings. Neither did it challenge the Commission's findings concerning the impact of the merger upon Auburn. Only when it came before the District Court did it raise its contentions. This alone might preclude its attack on the merger. But we need not decide that issue because we find that the Commission did not abuse its discretion in refusing to take evidence in 1967 as to the impact of the merger on Auburn.

In the record upon which the Second Report is based the Commission had evidence of the impact of the yard's closing on the city. Thus, even assuming the closing, the Commission found that the long-run effect of the merger would be to benefit communities in the Northern Tier, such as Auburn, and that the brief and transitory dislocations the merger would occasion were not sufficient to outweigh the merger's benefits. We find this to be a justifiable conclusion supported by substantial evidence on the record. We can hardly imagine any merger of substantial carriers that would not cause some dislocations to some shippers, some communities, and some employees.

The plans for the Auburn yard now seem to be altered; the applicants stated before the District Court and again

before this Court that they now intend to maintain the Auburn yard. As a result, employment in Auburn will be largely unaffected by the merger. Since we conclude that the Commission properly determined that Auburn's hardships and those of communities similarly situated, as posited on the record, did not warrant disapproval of the merger, it is difficult to imagine any basis upon which we might find the Commission to have abused its discretion in not taking further evidence on the merger's impact on Auburn when the principal harm of which the city earlier complained has disappeared.

(d) *No. 44, Livingston Anti-Merger Committee.*—Citizens of Montana, living in and about Livingston, Helena, and Glendive, who appear here as the Livingston Anti-Merger Committee, attack the merger on several grounds. As a prelude to discussing these contentions, the historical facts upon which the Committee's attack is based should be stated.

In 1864 Congress created the Northern Pacific Railroad Company (Railroad) and granted it authority to build a railroad from Lake Superior to Puget Sound. To subsidize this enterprise Congress granted Railroad a right-of-way and alternate sections of land along that right-of-way. According to the terms of Railroad's charter it could not encumber its franchise or right-of-way without congressional approval, and was not authorized to merge with another road, except under limited conditions not relevant here.[18] In 1870 Congress passed a resolution allowing Railroad to issue bonds secured by its property and subject to foreclosure for default. Shortly thereafter a mortgage was pledged, only to be foreclosed in 1875. After the foreclosure proceedings the property was struck off to a committee of bondholders. Later, however, the property was returned to Railroad pursuant to a reorganization plan. Although Congress did not further author-

---

[18] See Act of July 2, 1864, § 3, 13 Stat. 367.

ize mortgaging of the franchise or right-of-way, Railroad again encumbered its property by pledging several mortgages. In 1896, after these mortgages had been defaulted upon and foreclosure proceedings had been commenced, a negotiated settlement was made which resulted in the property of Railroad being sold to the Northern Pacific Railway Company (Railway), which has operated under Railroad's franchise and upon its right-of-way ever since. Railway presently owns 97% of the stock of Railroad, which is no longer an operating company.

On the basis of these facts Livingston contends that the Interstate Commerce Commission had no authority to approve the proposed merger because Railway does not own the franchise and right-of-way involved in this merger, and Railroad is not a party to the merger. Livingston argues that the 1896 foreclosure was a sham and it actually was a sale of Railroad property to Railway; because Congress never authorized that sale, it is void. In addition, Livingston contends that the mortgages that led to the 1896 foreclosure were not authorized by Congress; therefore, they could not constitute the basis for a valid foreclosure and liquidation. The claimed consequence is that the title to the franchise and right-of-way remains in Railroad. Livingston argues that even if it should be held that Railway does own the franchise and right-of-way, under the 1864 charter of Railroad, to which Railway succeeded, no merger involving these properties can take place without congressional approval, and such approval has not been procured. Finally, Livingston urges that the Commission and the District Court failed to properly deal with these contentions and make specific findings as to the Commission's jurisdiction.

The Commission was presented with these arguments and found them to be without merit. The District Court affirmed the Commission, ruling that it had not erred in refusing to disapprove the merger because of appel-

lant's claims and had not erred in refusing to litigate their merits. We affirm the District Court. Section 5 (2) (a) of the Interstate Commerce Act provides in pertinent part:

> "(a) It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b) of this paragraph—
>
> "(i) for two or more carriers to consolidate or merge their properties or franchises, or any part thereof, into one corporation for the ownership, management, and operation of the properties theretofore in separate ownership . . . ." 49 U. S. C. § 5 (2) (a).

The premise of Livingston's position is that under this statute before the Commission can assume jurisdiction over a merger application it must determine that the applicants have proper legal title to the rights and property which they seek to bring into the merger. This is an erroneous assumption. The Commission is not required to deal with the subtleties of "good title" before assuming jurisdiction over a § 5 matter. Cf. *O. C. Wiley & Sons* v. *United States,* 85 F. Supp. 542, 543–545 (D. C. W. D. Va.), aff'd *per curiam,* 338 U. S. 902 (1949); *Walker* v. *United States,* 208 F. Supp. 388, 396 (D. C. W. D. Tex. 1962); *Interstate Investors, Inc.* v. *United States,* 287 F. Supp. 374, 392 n. 32 (D. C. S. D. N. Y. 1968), aff'd *per curiam,* 393 U. S. 479 (1969). And because a Commission order under § 5 (2) "is permissive, not mandatory," *New York Central Securities Corp.* v. *United States,* 287 U. S. 12, 26–27 (1932), the approval of a merger proposal does not amount to an adjudication on any such questions. These are matters for the courts, not for an agency that has responsibility in the realm of regulating transportation systems.

In the instant case there were ample grounds for the Commission's assumption of jurisdiction over the appli-

cants. Although the validity of Railway's claim that it is Railroad's successor in interest and has good title to all of Railroad's rights and properties has never been judicially determined, this Court has impliedly recognized it several times. In *Northern Pacific R. Co.* v. *Boyd,* 228 U. S. 482 (1913), we held that a creditor of Railroad had an assertable claim against the equity of Railroad's shareholders represented by Railway's assets because the foreclosure amounted to little more than a judicially approved reorganization in which the shareholders of the old company became the shareholders of the new. As against a bona fide creditor of Railroad, we found the judicial sale ineffective to bar his rights. However, we also stated that

> "[a]s between the parties and the public generally, the sale was valid. . . . [T]he Northern Pacific Railroad was divested of the legal title [to its properties] . . . ." *Id.,* at 506.

In *United States* v. *Northern Pacific R. Co.,* 311 U. S. 317 (1940), we described some of the history of the appellee company as follows:

> "Pursuant to foreclosure proceedings the Northern Pacific Railway Company acquired title to the railroad, the land grant, and all other property of the original corporation and has since operated the road and obtained patents for millions of acres under the land grants." *Id.,* at 328.

In addition, Attorney General Harmon in 1897 advised the Secretary of the Interior that Railway had a right, as successor in interest of Railroad, to patents on land grants made to Railroad. 21 Op. Atty. Gen. 486. The Secretary of the Interior thereafter treated Railway as Railroad's legal successor and patented large amounts of land to Railway. When in 1905 the then Secretary of the Interior asked then Attorney General Moody, later an Associate Justice of this Court, about the right of

Railway to Railroad's land grants, Mr. Moody, after investigating the matter, reaffirmed his predecessor's conclusion that Railway was Railroad's legitimate successor in interest. 25 Op. Atty. Gen. 401. In 1954 a committee of Railroad's minority shareholders sued Railway seeking to have the 1896 foreclosure set aside and all titles and franchises declared to be in Railroad and to obtain an accounting from Railway for all properties and profits received from 1896 through 1954. In an exhaustive opinion Judge Edward A. Tamm of the United States District Court for the District of Columbia held the action barred by laches and dismissed the complaint. *Landell* v. *Northern Pacific R. Co.*, 122 F. Supp. 253 (D. C. D. C. 1954), aff'd, 96 U. S. App. D. C. 24, 223 F. 2d 316, cert. denied, 350 U. S. 844 (1955). In this context we think the Commission did not err in assuming jurisdiction over the applicants while refusing to adjudicate the merits of Railway's title. As the District Court stated, "[f]or purposes of merger proceedings it could rely on the existing judicial records . . . supplemented by the opinions of two Attorneys General." [19]

We are then faced with the contention of Livingston that Railway is prohibited from participating in the merger and that the Commission is barred from approving it by the terms of Railroad's charter. That charter does not authorize Railroad to merge with the applicant companies and prohibits the mortgaging of its property in the absence of congressional consent. If Railway is Railroad's successor in interest, Livingston contends, it is bound by the provisions of Railroad's charter, and those provisions would be violated by the proposed merger and issuance of securities incident thereto. Livingston argues that because the Act chartering Railroad is a law as much as it is a grant, see *Oregon & California R. Co.* v. *United States*, 238 U. S. 393, 427 (1915), it is bind-

---

[19] 296 F. Supp. 853, 877 (D. C. D. C. 1968).

ing upon the Commission and makes the Commission's approval of the merger unlawful. Livingston relies upon *Union Pacific R. Co.* v. *Mason City & Fort Dodge R. Co.,* 199 U. S. 160 (1905), as standing for the proposition that statutory restrictions on a predecessor federal railroad company survive a foreclosure sale and apply to a successor private railroad company operating on the original company's rights and franchise.

We do not find the *Mason City* decision to be controlling, despite its somewhat similar legal and factual context. In 1862 Congress chartered the Union Pacific Railroad Company and authorized it to build a transcontinental railroad. In 1865 Railroad, pursuant to congressional authorization, pledged a mortgage secured by its right-of-way and franchise to gain monies necessary for construction. In 1871 Congress granted Railroad authority to issue bonds for the construction of a bridge over the Missouri River, that grant being conditioned upon the bridge's being open for the use of all roads for a reasonable compensation, to be paid to the owner of the bridge. This condition was one generally inserted by Congress in statutes authorizing bridge construction. Sometime after the bridge was built the 1865 mortgage was foreclosed and the Union Pacific Railroad Company, a Utah corporation, purchased the assets of the federal corporation. It thereafter refused to allow any but its own trains to use the bridge, contending that as purchaser under the foreclosure of the 1865 mortgage, it was not bound by the 1871 statute's conditions. This Court rejected that contention and concluded that the conditions applied to the Utah corporation, reasoning that the purpose of Congress in authorizing the construction of the bridge required that the conditions appended to that authorization attach to the bridge and bind its owner.

The instant case is quite different. Here the provisions of the charter of Northern Pacific Railroad Company which are urged to bar this merger were directed only to

the operations of the federal corporation, not to the operation of the railroad. Thus, when the corporation's property was sold to another, the conditions of which Livingston speaks did not follow that property into the hands of the successor corporation. It therefore follows that the statute creating the Northern Pacific Railroad Company did not bar the Interstate Commerce Commission from authorizing a merger involving the Northern Pacific Railway Company, a Wisconsin corporation.[20] We find that the Commission acted within its authority in assuming jurisdiction over the instant merger proposal and that Railway is not barred by the statute from participating in that merger. We have considered Livingston's other contentions and find them to be without merit.

### Conclusion

On the entire record we cannot say that the District Court erred in upholding the order set forth in the Second Report or that the Commission has done other than give effect to the Transportation Act of 1920 as amended in 1940, which vested in the Commission the responsibility of balancing the values of competition against the need for consolidation of rail transportation units.

The judgment of the District Court is therefore affirmed and the stay granted by this Court pending the resolution of these appeals is hereby vacated.

[Appendixes A and B follow this page.]

MR. JUSTICE DOUGLAS took no part in the decision of these cases.

---

[20] Appellees contend that under §§ 5 (11) and 20a (7) of the Interstate Commerce Act, 49 U. S. C. §§ 5 (11), 20a (7), the approval of a consolidation proposal operates to relieve the applicants from any inhibiting state or federal laws, that the charter of Railroad is such a law, and that approval of the instant merger proposal modifies any conflicting provisions in that charter. Since we do not find Railroad's charter to be binding upon Railway, we need not reach that contention.

Legend

‾‾‾‾‾‾‾‾ Northern Lines, Burlington and subsidiaries, and
SP&S

────────── Milwaukee