**CITY OF NEW YORK, Plaintiff, and Bush Terminal Railroad Users Association, Inc., et al., Intervening Plaintiffs,**

v.

**The UNITED STATES of America et al., Defendants.**

Civ. No. 71–C–1639.

United States District Court,
E. D. New York.

Jan. 20, 1972.

Louis Walters, Asst. Corp. Counsel (J. Lee Rankin, Corp. Counsel for City of New York, Peter C. Demetri and Eleanor Oppenheimer, Asst. Corp. Counsels, of counsel), for plaintiff.

Stacey L. Wallach, New York City (Tenzer, Greenblatt, Fallon & Kaplan, New York City, of counsel), for intervening plaintiff, Bush Terminal Users Ass'n.

William C. Mahoney, Washington, D. C., for intervening plaintiffs, United Transportation Union and Brotherhood of Railway, Airline & Steamship Clerks, Freight Handlers, Express & Station Employes.

John C. McTiernan, Asst. Counsel, N. Y. State Dept. of Transportation, Albany, N. Y., for intervening plaintiff, State of New York.

Lloyd H. Baker, Asst. U. S. Atty. (Robert A. Morse, U. S. Atty. Eastern District of New York, of counsel), for defendant, the United States.

Theodore C. Knappen, Washington, D. C., Asst. Gen. Counsel, for defendant, Interstate Commerce Commission.

G. Clark Cummings, New York City, for defendant, Bush Terminal R.R.

Before FRIENDLY, Chief Circuit Judge, MISHLER, Chief District Judge, and WEINSTEIN, District Judge.

FRIENDLY, Chief Circuit Judge:

In this action against the United States, the Interstate Commerce Commission, Bush Terminal Railroad and certain of the latter's officers and directors, the City of New York, joined by several intervenors, asks us to annul an order of the Interstate Commerce Commission dated December 13, 1971, in F.D. No. 25896, which authorized abandonment of the entire line of Bush Terminal Railroad Company (the Railroad) in Kings County, New York, and Hudson County, New Jersey. The order, which was effective immediately, was entered after the Railroad on December 1, 1971, had unilaterally imposed an embargo on all outgoing freight and announced that on December 15, 1971, it would impose a similar embargo on all incoming freight, because of the allegedly unseaworthy condition of its marine equipment, and after users of the Railroad had begun an action to enjoin the embargo which they considered to be an unauthorized abandonment. The Railroad terminated operation on December 13 immediately on learning of the Commission's order.[1]

On December 17, the City began this action and sought a temporary restraining order, see 28 U.S.C. § 2284(3). Judge Weinstein denied this but set the City's motion for a temporary injunction for argument on December 22 before a three-judge court which he asked to have convened, 28 U.S.C. §§ 2321, 2325. At the argument, the Bush Terminal Users Association, Inc., United Transportation Union, the Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employes, and the Department of Transportation of the State of New York were allowed to intervene as plaintiffs. Issuance of

1. We understand that arrangements were made whereby New York Dock Railway, apparently using some of the Railroad's equipment, handled distressed freight in the immediate vicinity of the City of New York.

a temporary restraining order was again refused, but we reserved decision on the motion for a temporary injunction pending the filing of the record and briefs.

The Railroad, organized in 1903, is a wholly-owned subsidiary of Bush Universal, Inc., which had been known as Bush Terminal Company until July, 1968. The purpose of establishing the Railroad was to acquire franchise rights in city streets and extend to new buildings railroad services then being provided in Brooklyn, New York, by Bush Terminal. The line owned by the Railroad is only 1.8 miles long. This connects with some 13.56 miles of track in Brooklyn and car-float and towage facilities that are operated by the Railroad but are owned and had previously been operated by Bush Terminal, allegedly as agent for the Railroad and for trunk line carriers serving New York Harbor. In Bush Terminal R.R. Co. Operation, 257 I.C.C. 375 (1944), the Commission authorized the Railroad, pursuant to § 1(18) of the Interstate Commerce Act, to extend its railroad by acquiring through lease the trackage and other facilities owned by Bush Terminal. The lease took effect on January 1, 1945. Since then the Railroad, as a common carrier, has moved cars between industries in and near the Bush Terminal in Brooklyn across New York Harbor to and from various trunk line terminals in New Jersey. In December, 1968, Bush Terminal, having changed its name and become a conglomerate, controlled by Universal Consolidated Industries, Inc., a still more conglomerated conglomerate, conveyed all its real estate, including some of the land over which the Railroad operates, to a newly organized, wholly owned subsidiary, Bush Terminal Company, Inc. This new subsidiary assumed its parent's obligations under the lease to the Railroad. We will generally refer to Bush Universal, Inc. and Bush Terminal Company, Inc., simply as "the Terminal Company."

The Railroad, on October 23, 1969, filed an application under § 1(18) of the Interstate Commerce Act for permission to abandon the operation both of its owned and of its leased properties. Hearings were held in late June, 1970. The application was opposed by users of the service, governmental and quasi-governmental bodies and labor organizations representing the Railroad's employees. In their post-hearing briefs the City, the State, and the Users Association for the first time raised the issue that authorization of abandonment by the lessee, the Railroad, would not relieve the lessor, the Terminal Company, of its independent obligation to operate the leased properties, an obligation that would revive upon discontinuance of operations by the lessee. See Lehigh Valley R.R. Co. Proposed Abandonment of Operation, 202 I.C.C. 659, 663 (1935); Norfolk S.R.R. Co. Receivers Abandonment, 221 I.C.C. 258, 260 (1937); Livestock Terminal Service Co. Abandonment of Operation, 257 I.C.C. 1, 7 (1944); Hoboken R.R., Whse. & S.S. Connecting Co. Operation, 257 I.C.C. 739, 743–44 (1944). The Railroad responded, correctly enough as a matter of law, see Meyers v. Famous Realty, Inc., 271 F.2d 811, 814–815 (2 Cir. 1959), cert. denied, 362 U.S. 910, 80 S.Ct. 681, 4 L.Ed.2d 619 (1960), that this doctrine applies only when the lessor was a "carrier by railroad," see 49 U.S.C. § 1(18), when the lease was made; it claimed that the Terminal Company was not.

On June 3, 1971, the examiner rendered a report recommending authorization of the abandonment. He found that, despite various promotional efforts, the Railroad's traffic had seriously declined, due to motor vehicle competition, and the moving of industries away from the Brooklyn area served by it; that the Railroad "has sustained substantial losses for many years, and prospects for reversing the decline in traffic and for profitable operations are very slim;" and that the property owned and leased by the Railroad was in such poor condition that an expenditure by it of approximately $930,000 would be required for

rehabilitation of roadway and marine equipment.[2] With the Railroad's long record of losses and negative net worth, these funds could not be obtained except from the parent. The examiner concluded that, despite undoubted hardship to users, which might require many to move, with consequent loss of employment opportunities and revenues to the City and the State, there was no alternative to authorizing abandonment by the Railroad. Turning to the legal argument concerning the obligations of Terminal Company as lessor, the examiner concluded that this raised a factual issue of the lessor's earlier common carrier status, which had never previously been resolved and which could be tested in an action by the objecting parties under § 1(18) and (20). Thus, he declined to condition abandonment by the Railroad upon resumption of operation of the leased properties by the Terminal Company. Following the Commission's general practice in cases of complete abandonment where neither the carrier nor a parent carrier realizes economic advantages other than the termination of losses,[3] see Chicago, A. & S.R.R. Co. Receiver Abandonment, 261 I.C.C. 646, 652 (1946); Okmulgee Northern Ry. Co. Abandonment, 320 I.C.C. 637, 645–646 (1964); Manifestee & Repton R.R. Co. Abandonment, 324 I.C.C. 489, 492 (1964); Tennessee Central Ry. Co. Abandonment of Operations, 333 I.C.C. 443, 453–454 (1968), he declined to impose employee protective conditions.

Exceptions and a reply thereto by the Railroad were filed with the Commission in early August. The City's, the Unions' and the Users Association's exceptions requested oral argument. On November 3, the Users Association filed a petition for leave to file a petition to reopen the hearing to include further testimony concerning the willingness of users to pay a surcharge of $25 per car.

2. The equipment used in the Railroad's operation is owned by the Terminal Company. Under the leasing arrangement, the Railroad is responsible only for maintenance expenses; capital expenditures with respect to the leased properties are the obligation of the Terminal Company. The cost of rehabilitating all the trackage used by the Railroad was estimated at $553,000. A marine consultant had testified that the operating machinery of the tug used by the Railroad was rattling, and that renewal of this plus other necessary tug repairs would cost $115,000. The short term cost of repairing the seven car floats used by the Railroad would be $280,000. These are all maintenance expenses which would have to be paid by the Railroad, leading to the $930,000 estimate.

Substantial capital expenditures on the part of the Terminal Company are also needed. The condition and age of the six locomotives—four are more than 39 years old; two are more than 25 years old—used by the Railroad are such that it would be more advisable to replace them than to repair them. The cost of the three replacements which would be needed was estimated at $379,700. Similarly, the car floats were 25 to 47 years old and all but one leaked. The marine consultant testified that it would be more practicable to buy six new car floats than to repair the seven old ones. New car floats would cost $300,000 each.

In arriving at the $930,000 estimate, the examiner included the $280,000 estimate with respect to short term repairs by the Railroad on the car floats while apparently assuming that the Terminal Company would also have to purchase six new car floats at $300,000 each. Review of the marine consultant's testimony suggests that he considered purchase of new car floats as a preferable alternative to repairing the old ones, obviating the need for the expenditure of $280,000 by the Railroad. But even after adjusting for this, the Railroad would still have to make a substantial expenditure of approximately $650,000 to rehabilitate its roadbed and marine equipment. Moreover, in the long run, capital expenditures by the Terminal Company are not a meaningful panacea for the Railroad's interrelated financial and maintenance woes, since under the rental terms the Terminal Company ultimately recoups capital expenditures from the Railroad, see *infra*.

3. The only property owned by the Railroad, the rails over 1.8 miles of City streets, is likely to have a negative salvage value in light of the City's demand that the Railroad not merely pave over the tracks but remove them and repave the streets. The salvage value of the leased equipment to the owner is nominal.

The Railroad replied by letter. On December 13, the Commission, acting by Division 3, entered the order to which we have referred. This noted that the exceptions had raised "a substantial question of possible damage to the environment" as a result of the substitution of trucks for railroad cars but concluded that "any damage that may occur to environmental amenities by our approval of this application is to be outweighed by the proven economic harm that would result from its denial." It upheld the findings and conclusions of the examiner and decided that, save for the point just stated, the exceptions and reply thereto raised no new or material issue and were not of such a nature as to require the issuance of a report. After denying the petition of the Users Association for leave to file a petition to reopen the record, it adopted the hearing examiner's order of abandonment "as the order of the Commission, Division 3, effective on the date of service hereof," which was specified to be December 13.

## I.

█ If we were to view the matter apart from certain special considerations urged by the plaintiff and intervenors, it would be clear that the order of abandonment was supported by substantial evidence at the time it was issued. Between 1959 and 1969, the Railroad's traffic declined from 618,053 to 459,685 tons. During the same period, traffic for four types of customers—tenants of the Terminal Company; tenants of an unrelated organization, Bush Terminal Associates; customers located on private sidings; and the Brooklyn Army base—fell from 13,-490 to 4,165 cars, those from the Army base having later dwindled to zero. Losses have been incurred every year since 1959. These attained highs of $368,431 and $376,644 in 1966 and 1967; while the losses for 1968 and 1969 were less, $311,910 and $220,582, respectively, the Railroad persuasively claimed the reduction was due principally to the de-

ferral of maintenance expenditures which would have to be made if it were required to continue operations. The balance sheet as of December 31, 1969, shows current assets of $451,242 and current liabilities of $1,990,754.[4] The story seems to be the familiar one of decreased usage and higher costs leading to deterioration of plant, and deterioration of plant then leading to further decrease in usage and still further deterioration, until a time finally comes when the operation grinds to a halt, with attendant hardship on the remaining users and the employees. Courts are not free to annul the Commission's decision to allow abandonment under such circumstances simply because greater wisdom at an earlier date on the part of all concerned might have preserved a valuable transportation enterprise. See Washington & Old Dominion Users Ass'n v. United States, 287 F.Supp. 528 (E.D.Va. 1968) (three-judge court); Asbury. v. United States, 298 F.Supp. 589 (W.D.Va. 1969) (three-judge court). As the examiner said, "an unprofitable operation cannot be expected to continue indefinitely for the benefit of shippers who may be adversely affected but who do not furnish sufficient traffic to support a line, or to furnish transportation during periods when trucks experience difficulty operating, or for such commodities as may not be handled economically by trucks."

█ Before the hearing examiner, the plaintiffs argued that the loss figures constituted only bookkeeping losses which must be disregarded because they reflect intercompany charges arising out of a leasing arrangement between a parent and a wholly owned subsidiary, and that the Railroad and its parent must be viewed as a single entity to obtain an accurate financial picture. The examiner had abundant basis for rejecting these arguments. The Commission had earlier found the leasing arrangement between the Terminal Company and the Railroad to be fair, 257 I.C.C. at 379–381, and the

---

4. The latter figure includes accrued accounts payable of $1,718,426, of which $1,560,055 was due to the Terminal Company.

examiner received and adopted new testimony reinforcing this conclusion. Apart from an annual fee of $25,000 for services such as telephones, casual engineering, and payroll accounting, which has remained unchanged since 1945 and which the Examiner permissibly found to be fair, indeed, low, payments were made for services actually rendered— such as maintenance work and managerial services of officers of the Railroad who are also officers of the Terminal Company—and for rent calculated on the basis of a basic rental component and a percentage rental component as provided in the lease. The percentage rental is 75% of the Railroad's net earnings from both its leased and owned properties; the basic rental is essentially an amount equivalent to property taxes, depreciation, and 5½% of the assessed value of the leased real estate and the agreed value of the other leased property. An owner would have incurred the various service and managerial expenses. No payment of percentage rental has been made since 1959, there having been no net earnings since that date. Finally, the basic rental provides less than a fair rate of return, at least under current conditions where prime corporate bonds command rates in the neighborhood of 7%. In fact, in 1966, 1967, and 1968, the Railroad's actual payments to the Terminal Company were less than the current charges other than rent;[5] if it had been independently operated and had bonds outstanding, it would long since have had to take advantage of § 77 of the Bankruptcy Act. In short, it does not appear that the intercompany charges were either improper or unreasonable.

■ Much is sought to be made of the benefit which the parent received from the Railroad's losses in its consolidated income tax return, but did not pass on to the Railroad. Whatever bearing this might or might not have on a claim by the Terminal Company in the case of insolvency on the part of the Railroad, cf. Western Pacific R.R. Corp. v. Western Pacific R.R. Co., 206 F.2d 495 (9 Cir.), cert. denied, 346 U.S. 910, 74 S.Ct. 241, 98 L.Ed. 407 (1953), the mere fact that, due to other income of the parent, the ultimate impact of the Railroad's losses may be less than if it stood alone, would not justify requiring railroad operations to be continued at a loss. Only the railroad business is to be considered in deciding whether an operation is unprofitable and should be abandoned. See Brooks-Scanlon Co. v. Railroad Comm'n, 251 U.S. 396, 399, 40 S.Ct. 183, 64 L.Ed. 323 (1919). This same principle also disposes of the contention that the parent, with its other profitable businesses, and the Railroad should be viewed as a single entity for financial accounting purposes, thus purportedly eliminating any showing of loss. Problems of constitutional dimensions would be raised by requiring a company to subsidize a losing railroad operation with non-railroad businesses, see id.—particularly in a case such as this where the railroad business has failed to show a profit for some ten years. For purposes of this abandonment proceeding, then, the Railroad's historical losses are real, substantial, and not exaggerated by intercompany transactions.[6]

Relying on a lease provision obligating the lessor to make capital expenditures

5. Furthermore, the Terminal Company has never charged the Railroad interest on its ever mounting debt.

6. Nor, taken alone, would the offer of the unions to eliminate one train crew have meaningfully alleviated the economic plight of the Railroad as established by the evidence before the hearing examiner. Even assuming the full annual cost of approximately $60,000 would be realized as savings, this would not be by any means sufficient to provide the Railroad with a reasonable possibility of bringing expenses into line with revenues, much less to ensure adequate funds for much needed maintenance. Whether, when combined with steps proposed to generate additional revenues, the cost saving produced by the elimination of one train crew would be enough to make the Railroad profitable once again is a separate question, see Part III infra.

with respect to the leased property, the plaintiffs advance a further argument that the serious condition of the equipment used by the Railroad is the result of the Terminal Company's failure to make necessary capital expenditures and the size of the estimated maintenance expenditures now necessary should therefore be appropriately discounted. More specifically, the lease provides that although the lessee is required to maintain the properties at its own expense, the lessor is obligated to make capital expenditures—if not occasioned by the lessee's failure to maintain—with the provisos that the lessor could terminate the lease if more than $100,000 of such capital expenditures were required in any year and that the lessee could either terminate the lease or make capital expenditures at the expense of the lessor if the latter failed to make necessary capital expenditures. There is evidence in the record which indicates that from 1960 through 1969 the Terminal Company made capital expenditures amounting to $786,751 with respect to the leased properties. This would suggest that only a little more than $200,000 additional capital could have been called upon in that ten year period to replace the large amount of rundown equipment being used by the Railroad. Even assuming that the lessee could have called upon the lessor to make additional major capital expenditures and that the result would have been a substantial reduction in the maintenance expenditures now necessary on the part of the lessee, it should be recognized that in fact any such capital expenditures must ultimate-ly be paid for by the lessee since, among other things, the basic rental consists of a depreciation charge and an interest component. Thus, in the 1960 through 1969 period, depreciation charges payable to the Terminal Company by the Railroad amounted to $592,670. Also the record clearly shows that throughout much of that period the Railroad was in default in the payment of rent. By December 31, 1964, the Railroad owed the Terminal Company over four hundred thousand dollars and that sum increased to more than a million and a half by December 31, 1969. Indeed, since 1965, the annual increase in the Railroad's debit balance to the Terminal Company has exceeded $100,000. In light of these figures, it is very doubtful that the lessor has been obligated to make any capital expenditures for some time [7]—at the least, not since the Railroad has been in default on its rent. Consequently, we see no basis for discounting the substantiality of the maintenance expense facing the Railroad should it be required to continue operations.

We have reviewed the evidence before the Commission concerning the Railroad's physical and financial condition at this length in order to delimit the extent to which reconsideration of the specific matters here discussed [8] will be necessary on the remand to be prescribed in what follows. Compare Massachusetts Bay Telecasters, Inc. v. FCC, 104 U.S.App.D.C. 226, 261 F.2d 55, 65 (1958), modified, 111 U.S.App.D.C. 144, 295 F.2d 131 (Cir.), cert. denied, 366 U.S. 918, 81 S.Ct. 1094, 6 L.Ed.2d 241 (1961).

7. Thus, while a problem of considerable interest would be raised if a parent used its power to prevent an operating subsidiary from exercising contractual rights against the parent, performance of which might have averted the conditions now requiring abandonment, cf. W. R. Grace & Co. v. CAB, 154 F.2d 271 (2 Cir.), cert. granted sub nom. Pan American Airways Corp. v. W. R. Grace & Co., 328 U.S. 832, 66 S.Ct. 1378, 90 L.Ed. 1608 (1946), dismissed as moot, 332 U.S. 827, 68 S.Ct. 203, 92 L.Ed. 401 (1947), that question is not presented here.

8. We do not at this time decide whether the Commission was correct in concluding that the order of abandonment should not have been conditioned upon resumption of operations by the Terminal Company, or in refusing to impose labor protective conditions, since the further action by the Commission which we direct *infra* could make review of these questions unnecessary.

## II.

Despite the bleak financial picture of the Railroad's past history and future prospects established before the hearing examiner, we are confronted with a serious argument by the plaintiff and intervenors that the Commission has acted here in violation of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321–47. Although this abandonment proceeding was initiated before NEPA became effective on January 1, 1970, all agency hearings and decision-making occurred long after the effective date. Consequently, we have no doubt that NEPA was applicable. Cf. Environmental Defense Fund, Inc. v. Corps of Engineers, 324 F.Supp. 878, 880 (D.D.C.1971); Environmental Defense Fund, Inc. v. Corps of Engineers, 325 F.Supp. 728, 743–744 (E.D. Ark.1971). While the Commission may initially have thought that, as a general matter, abandonment proceedings were not within the provisions of NEPA, subdivisions (A), (B), and (D), among others, of § 102(2), 42 U.S.C. § 4332(2), impose a number of duties on all federal agencies with respect to the consideration and exploration of the environmental effects of their decisions and plans, and the obligation of a federal agency to adhere to these subdivisions in all instances is essentially unqualified.[9] In addition, in cases of "major Federal actions significantly affecting the quality of the human environment," § 102(2) (C) requires the federal agency to include in its report a "detailed statement" which comprehensively considers the effect of the proposed action upon the environment and alternatives thereto. At the time of the hearings in this proceeding, it may not have been entirely clear from the statute or from the Interim Guidelines published by the Council on Environmental Quality (CEQ), 35 Fed. Reg. 7390–93 (May 12, 1970), revision proposed, 36 Fed.Reg.1398–1402 (Jan. 28, 1971), guidelines published, 36 Fed. Reg. 7724–29 (April 23, 1971), that a railroad abandonment proceeding, despite its potential for increase in the use of alternative modes of transportation with greater polluting effects, such as trucks, constituted the type of federal action which requires a detailed environmental statement as prescribed in § 102 (2) (C). However, the Commission has gone a long way to resolving whatever doubt there was on the question by its proposed rules which include railroad abandonment proceedings among those actions which may have a significant effect on the quality of the environment. See ICC Notice of Proposed Rule Making: Implementation of National Environmental Policy, App. A(d) (2), 36 Fed.Reg. 10807, 10809 (June 3, 1971). And although it is evident that the Commission has been slow in reacting to the directive of the CEQ, 35 Fed.Reg. 7390–93 (May 12, 1970), and of NEPA itself, that each federal agency establish formal procedures to guide the preparation of §

9. While § 102 contains the qualification "to the fullest extent possible," this does not appear to have been intended to relax the obligation of administrative authorities to perform the duties set forth in the section. To the contrary, the conference committee which added this language stated that its purpose

> is to make it clear that each agency of the Federal Government shall comply with the directives set out in [ § 102(2)] unless the existing law applicable to such agency's operations expressly prohibits or makes full compliance with one of the directives impossible . . . . Thus, it is the intent of the conferees that the provision "to the fullest extent possible"

shall not be used by any Federal agency as a means of avoiding compliance with the directives set out in section 102. Rather, the language in section 102 is intended to assure that all agencies of the Federal Government shall comply with the directives set out in said section "to the fullest extent possible" under their statutory authorizations and that no agency shall utilize an excessively narrow construction of its existing statutory authorizations to avoid compliance.

Conference Report No. 91–765, 91st Cong., 1st Sess. (1969), U.S.Code Cong. & Admin.News, p. 2770. See also Port of New York Authority v. United States, 451 F.2d 783, 789 n. 26 (2 Cir. 1971).

102(2) (C) environmental impact statements, this cannot, excuse the Commission's failure to consider adequately the provisions of NEPA once the Act had become effective.

The examiner's report gave no consideration to the environmental implications of the abandonment of the Railroad's operations. None of the protestants had sought at the hearing to develop the record in this respect. The environmental issue was first raised by the City in its Exceptions to the examiner's report. It argued there that if 13,500 carloads—which it assumed to be the Railroad's annual traffic—were moved by truck, substantial additional tonnage of pollutants would be discharged.[10] The Railroad replied that these figures were highly exaggerated, particularly since much of the protestants' argument at the hearing and in their exceptions was not that users would turn to trucks but rather that they would move away as soon as their leases expire, or perhaps even before. Whatever the merits of these opposing views, it is apparent that there is likely to be some adverse environmental effect as a result of the abandonment. Yet the only agency consideration given the environmental issues is the cursory statement of Division 3 which we set out in the margin.[11] In our opinion, this is insufficient to establish compliance with, in particular, § 102(2) (B) & (D), much less with the detailed requirements of § 102(2) (C).

We recognize that the Commission was here faced with a relatively new statute so broad, yet opaque, that it will take even longer than usual fully to comprehend its import. The protestants compounded an already difficult situation by waiting until the eleventh hour to raise an important question which would best have been considered from the outset. Further, we are not eager to remand for what may well be a largely ritualistic act. We have serious question whether, in view of the consistent record of losses and the large sums needed to remedy deferred maintenance and for capital expenditures and the unavailability of any likely source for these, there is any alternative to allowing abandonment here, despite adverse environmental effects. A recent offer by the Users Association, discussed *infra*, perhaps offers at least a glimmer of hope. But at this juncture the Railroad appears unable to continue, and has operated as long as it has only because the

10. The figures in the City's Exceptions, which were not otherwise of record, were:

Emission Tons Per Year

| | (low) Assuming 26,314 trucks | (high) Assuming 59,200 trucks |
|---|---|---|
| Carbon monoxide | 14,000 | 31,000 |
| Hydrocarbons | 1,950 | 4,900 |
| Oxides of Nitrogen | 3,900 | 7,950 |
| Particulate | 310 | 600 |

11. This, in full text, is

*It appearing,* That, although a substantial question of possible damage to the environment has been raised, denial of the application herein will almost certainly result in the financial collapse of the applicant, which would, in effect, substitute economic waste for brief postponement of the envisoned environmental damage; and that under the balancing test prescribed by the court in Calvert Cliffs' Coordinating Committee, Inc., et al. v. Atomic Energy Commission, No. 24,839 (U.S.Ct. App., D.C.1971) [449 F.2d 1109], as in accordance with Section 102 of the National Environmental Protection Act, any damage that may occur to environmental amenities by our approval of this application is to be outweighed by the proven economic harm that would result from its denial . . . . .

Terminal Company has not pressed for collection of increasing amounts—now more than a million and a half dollars—owed to it. We find no indication in NEPA that Congress meant to authorize an agency to compel a parent or sister company to finance a losing subsidiary or affiliate simply because the latter's demise will have an unfortunate effect on the environment; and there would be the gravest doubt whether it constitutionally could under the circumstances here before us. See Brooks-Scanlon Co. v. Railroad Comm'n, *supra,* 251 U.S. 396, 399, 40 S.Ct. 183, 64 L.Ed. 323; Railroad Comm'n of State of Texas v. Eastern Texas R.R., 264 U.S. 79, 85, 44 S.Ct. 247, 68 L.Ed. 569 (1924); Pacific Tel. & Tel. Co. v. Tax Comm'n, 297 U.S. 403, 413, 56 S.Ct. 522, 80 L.Ed. 760 (1936) (Brandeis, J.); In re New York, N. H. & H. R. R., 304 F.Supp. 793, 801–803 (D.Conn.1969), aff'd in part and rev'd in part sub nom. New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970).

On the other hand, such considerations do not justify the Commission's disregard of the law. The tardiness of the parties in raising the issue cannot excuse compliance with NEPA; primary responsibility under the Act rests with the agency. See Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission, 449 F.2d 1109, 1118–1119 (D.C.Cir. 1971); cf. Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608, 620 (2 Cir., 1965), cert. denied, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966); Isbrandtsen Co. v. United States, 96 F.Supp. 883, 892 (S.D.N.Y. 1951) (three-judge court), aff'd sub nom. A/S Ludwig Mowinckels Rederi v. Isbrandtsen Co., 342 U.S. 950, 72 S.Ct. 623, 96 L.Ed. 706 (1952). Furthermore, the legislative history indicates that one of the strong motivating forces behind NEPA, and § 102 in particular, was to

make exploration and consideration of environmental factors an integral part of the administrative decision-making process. See S.Rep.No.91–296, 91st Cong., 1st Sess., U.S.Code Cong. & Admin.News, p. 2751; 115 Cong.Rec. 40416 (Dec. 20, 1969) (remarks of Senator Jackson). See also Calvert Cliffs', *supra,* 449 F.2d at 1112–1114. To permit an agency to ignore its duties under NEPA with impunity because we have serious doubts that its ultimate decision will be affected by compliance would subvert the very purpose of the Act and encourage further administrative laxity in this area. The systematic investigation of the abandonment of the Railroad's operations which NEPA requires may well reveal substantial environmental consequences and, given that the most recent offer of the Users Association may possibly provide an economic alternative to abandonment, compel further consideration of its propriety and necessity. In any event, preservation of the integrity of NEPA necessitates that the Commission be required to follow the steps set forth in § 102, even if it now seems likely that those steps will lead it to adhere to the present result. Thus, this proceeding must be remanded to the Commission for it to bring itself into compliance with the law.

### III.

The plaintiff and intervenors in this action have relied heavily on the willingness of the Railroad's users to submit to a surcharge. At the close of the hearing before the examiner, the Users Association suggested that if the Commission were disposed to authorize abandonment, the users would be willing to pay a surcharge sufficient to enable the Railroad to operate without serious loss. In its brief the Association suggested a surcharge of $10 per car, which it claimed would produce added annual revenue of $130,000.[12] The examiner dealt with

---

12. The Association used for its calculation an estimated traffic figure of 13,000 cars per year which was apparently derived from data available at that time for the years 1967, 1968, and 1969. More recent experience indicates that annual usage has since decreased by more than one-third, see note 15, *infra.*

this in a passage of his report, set forth in the margin.[13] Under the stimulus of a decision of Division 3 in Wellsville, Addison & Galeton R.R. Corp. Abandonment, 338 I.C.C. 604, served August 26, 1971, the Users Association, on November 3, filed a petition for leave to file a petition to reopen. This time the offer was upped to $25 per car, and was supported by affidavits of 21 shippers accounting for 2,000 carloads annually. As previously indicated, Division 3 denied leave to file. Finally, together with its brief in this action, the Users Association filed an affidavit which, in essence, puts forth its most recent and most substantial offer to pay a $25 surcharge. The affidavit purports to establish the willingness of 94 users, who ship and/or receive some 7,000 carloads annually, to pay such a surcharge.

 Were we not convinced that we must remand for further consideration of NEPA, we would dispose of the Users Association's three surcharge offers seriatim. First, we see no basis for quarreling with the examiner's rejection of the initial $10 offer on what little he had before him. The propriety of the refusal to consider the second offer turns on whether the Commission abused its discretion in denying the petition to reopen. While the Court of Appeals for this circuit has held that an order refusing to reopen is not "wholly immune from judicial examination," Cappadora v. Celebrezze, 356 F.2d 1, 5–7 (2 Cir.

1966); see also Blue Bird Coach Lines, Inc. v. United States, 328 F.Supp. 1331, 1337–1338 (W.D.N.Y.1971) (three-judge court), nevertheless, as recognized in the cases cited, the scope of review of such orders is exceedingly narrow. Courts must always bear in mind the warning of Mr. Justice Jackson:

> If upon the coming down of the order litigants might demand rehearings as a matter of law because of some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening.

Interstate Commerce Commission v. Jersey City, 322 U.S. 503, 514, 64 S.Ct. 1129, 1134, 88 L.Ed. 1420 (1944). Here there were no "new circumstances" at all. There was only the fact that the examiner's report had made the likelihood of abandonment more vivid for more users than it had been at the hearing stage. Furthermore, the companies joining in the second offer represented only 2,000 carloads which means a maximum of $50,000 in added revenue, making the doubtful assumption that they would continue their present usage at the higher rates. The plaintiff's argument that the Commission's action here cannot be reconciled with that in the *Wellsville* case, *supra,* 338 I.C.C. 604, is without force.[14] There was, in short,

---

13. No evidence was submitted in the record with respect to this proposal. The 12 protesting shippers, who are members of the Users Association, were not interrogated, and consequently were not cross-examined, concerning their willingness to pay an additional charge. The $130,000 figure was obviously based on all of applicant's traffic, and the Users Association, which has 32 members, was not authorized to speak for the over 300 other users of applicant's line, whether they are agreeable to the additional charge. Even if all shippers were willing to pay the additional $10 per car, the additional $130,000 in revenue would not convert the deficit operation to a profitable one, and would not provide funds for necessary rehabilitation. Also,

there is no assurance that shippers would continue to tender the present amount of traffic at the increased rate. In fact, the contrary may be expected, in view of the history of declining traffic.

14. First, Division 3's reversal of a review board in the *Wellsville* case rested on a number of factors, of which Erie-Lackawanna's offer of increased divisions of revenue with the applicant, 338 I.C.C. at 608, was only one. Also, an offer of increased divisions between two carriers, which can be made immediately effective and will not adversely affect interline traffic, differs substantially from the offer of some shippers to submit to a surcharge on shipments they choose to make by rail, which might or might not

no abuse of discretion in the Commission's denial of the petition to reopen. Finally, the newly offered affidavit would, in the normal course, be properly excluded from consideration in this action. "The rule is well settled that proceedings [under 28 U.S.C. § 2321] are not *de novo,* and ordinarily it is improper to allow the Commission's findings to be attacked or supported by evidence which the Commission had no opportunity of considering." Wycoff Co. v. United States, 240 F.Supp. 304, 308 (D.Utah 1965) (three-judge court), citing Louisville & N. R. R. v. United States, 282 U.S. 740, 51 S.Ct. 297, 75 L.Ed. 672 (1931); Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 54 S.Ct. 692, 78 L.Ed. 1260 (1934); American Trucking Ass'ns, Inc. v. United States, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953). See also Town of Inlet v. New York Cent. R. R., 7 F.Supp. 781, 784 (N.D.N.Y.1934) (three-judge court); Convoy Co. v. United States, 200 F.Supp. 10, 15–16 (D.Ore.1961) (three-judge court); Oklahoma Corporation Comm'n v. United States, 235 F.Supp. 803, 806–807 (W.D.Okl.1964) (three-judge court). The only exceptions to this rule are cases in which the jurisdictional facts doctrine of Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932), is raised or, at least in former days, in which a rate order is attacked as confiscatory. Interstate Investors, Inc. v. United States, 287 F. Supp. 374, 386 (S.D.N.Y.1968) (three-judge court), aff'd, 393 U.S. 479, 89 S.Ct. 707, 21 L.Ed.2d 687 (1969). Otherwise, the court's function in a proceeding such as this is only to review the decision of the Commission in light of the record before it. See Sakis v. United States, 103 F.Supp. 292, 313 (D.D.C.) (three-judge court), appeal dismissed by stipulation, 344 U.S. 801, 73 S.Ct. 4, 97 L.Ed. 625 (1952). It is consistent with

Mr. Justice Jackson's views concerning petitions to reopen that parties be obligated to develop the record fully before the Commission and not seek continually to introduce additional evidence. This assures that the Commission will be able to perform meaningfully the decision-making functions residing initially with it and that there is some semblance of finality and orderliness in the administrative process. Indeed, this most recent surcharge offer is a classic instance of evidence which could and should have been introduced before the trial examiner.

■ But there is, in our opinion, more at stake here than the interests of the named parties. To be sure, the precise consequences for the City, its economy, and its people are not readily ascertainable; but the Railroad's demise will undoubtedly be followed by the relocation of at least some users with the attendant loss of jobs for employees, loss of business for the users' suppliers and customers, and ultimately both economic and physical deterioration in the local community. Against this background, we note the Users Association's contention that the additional $175,000 in revenue ensured by its most recent surcharge offer, when combined with a union offer to eliminate one train crew producing an estimated annual cost saving of $60,000, see note 6, would make the Railroad's continued operation economically feasible. Considered in the light of 1969 financial figures, the Users Association points out that approximately $175,000 in additional revenues plus a $60,000 cost saving would turn a $220,-582 *loss* into a $14,418 *profit.* On the record before us we could only speculate on the correctness of the Users Association's position—although we do have certain fundamental doubts about its proffered calculations which the parties should seriously consider.[15] The neces-

---

be acceptable to others. Finally, the offer of increased divisions in *Wellsville* was fully developed in the original record, not a belated proffer four months after an examiner's adverse report and when decision was near.

15. In 1969 the Railroad handled approximately 13,000 carloads, whereas the very affidavit submitted by the Users Association to this court indicates that in 1971 the Railroad handled only some 8,000 carloads. If the amount of traffic

sity of remand to the Commission for further consideration of the environmental issue allows us to avoid such unwarranted speculation and to give sway to the substantial element of public interest contained in this case by directing the Commission on remand to reopen the administrative record and reevaluate the propriety of abandonment in light of the additional evidence tendered to this court concerning the willingness of users to pay a $25 surcharge.[16] On remand, both sides should present the most recent financial and traffic figures available, thus permitting an accurate reappraisal of the Railroad's future economic prospects assuming a $25 surcharge were put into effect.[17] We consider our action here to be consonant with the general principle that there must be finality in the administrative process; we direct further consideration of the Railroad's financial prospects with the most recent surcharge offer only because we must remand for failure to comply with NEPA in any event.

## IV.

In remanding this action to the Commission for further action we do not vacate its abandonment order of December 13, and thus we allow the Railroad to remain shut down pending further administrative action.[18] Although the Commission's failure to act in accordance with applicable law, specifically NEPA, would provide sufficient basis for vacating the Commission's order, see 5 U.S.C. § 706(2) (A), such action is not compelled. In reviewing the Commission's action, we sit as a court with equity powers, and as such

> may adjust relief to the exigencies of the case in accordance with the equitable principles governing judicial action. The purpose of judicial review is consonant with that of the administrative proceeding itself,—to secure a just result with a minimum of technical requirements.

Ford Motor Co. v. NLRB, 305 U.S. 364, 373, 59 S.Ct. 301, 307, 83 L.Ed. 221 (1939). See also Addison v. Holly Hill

---

handled by the Railroad has in fact declined so sharply, gross railway operating revenues today must be substantially less than in 1969 unless rate increases have occurred. Exactly what has happened to costs in the meantime is unclear. And even if the union's offer and the surcharge would cause the Railroad's operations to approach the break-even point, there must be some consideration of its immediate need to make large expenditures in order to repair its seriously deteriorated equipment.

16. Such a direction to reopen the administrative record to take in additional evidence where remand to the Commission is unavoidable on other grounds is not unprecedented, cf. Jarman v. United States, 219 F.Supp. 108, 119 (D.Md. 1963) (three-judge court).

17. Defendants have raised the question of the need for Commission action to make the surcharge binding on all users of the Railroad. Under 49 U.S.C. § 15(1), the Commission may act on its own motion to hold hearings and determine the reasonableness of a proposed rate. In its brief, the Commission argues essentially that the necessary rate-making hearing

would be lengthy and complex; the Users Association seems to think not. In any case, we see no inherent obstacle to the Commission making a rate determination in the context of this proceeding. And certainly if the Railroad's traffic is now in fact only 8,000 carloads annually, see note 15, *supra*, the Users Association's affidavit purporting to establish the willingness of users representing some 7,000 carloads annually provides the Commission with substantial and crucial evidence that the rate increase would not make motor carrier service preferable to rail service. In short, it is possible that the surcharge will be shown to provide economic hope for the Railroad and that the rate increase produced by the surcharge will be shown to be reasonable, and thus we think justified, whatever administrative effort is necessary to investigate these matters.

18. In its brief in this action, the Railroad has argued that even if we were to vacate the Commission's order, our actions would neither remove nor be determinative of the legality of its self-imposed embargo. We find it unnecessary to pass upon this.

Fruit Products, Inc., 322 U.S. 607, 619–622, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944). The special circumstances here justify our remanding for further consideration without the vacating of the Commission's order that would normally attend upon this. NEPA is a new and unusual statute imposing substantive duties which overlie those imposed on an agency by the statute or statutes for which it has jurisdictional responsibility. Initially harmonizing and integrating the special duties imposed by NEPA with an agency's traditional regulatory functions is not an easy task. What is more, the plaintiffs who now seek to benefit from the Commission's failure completely to perform the tasks imposed on it by NEPA exacerbated the problem by waiting until after the hearings were completed to raise the environmental question. While none of this can ultimately insulate unlawful administrative conduct from judicial correction, in the exercise of our equity powers we deem this sufficient, considering the seriously deteriorated condition of the Railroad, both physically and economically, as established by the evidence before the Commission, to warrant allowing the December 13 order to remain standing at this juncture for a short period while the Commission supplements the record on the environmental issue and then assesses whether its order should be in any way revised. Cf. Coffey v. Jordan, 107 U.S.App.D.C. 113, 275 F.2d 1 (1959).

Even more clearly this is a wholly logical posture in which to have this action proceed insofar as the additional evidence with respect to the surcharge offer is concerned. We have already explored the evidence at length and found that there was substantial basis in the present record for the Commission's conclusions with respect to the Railroad's current financial condition and future economic prospects. Even assuming the most recent surcharge offer so substantially alters the Railroad's financial prospects as to make abandonment inappropriate, it is nonetheless merely additional evidence which could and should have been presented to the hearing examiner. Thus, we do not think that this evidence can impeach the present validity of the December 13 order on the record now before us. At most, under the special circumstances of this case, this additional evidence can and does warrant supplementary action by the Commission —albeit this action may ultimately impugn the continuing propriety of the December 13 order and warrant its revision. Cf. Fleming v. FCC, 96 U.S. App.D.C. 223, 225 F.2d 523 (1955); Massachusetts Bay Telecasters, Inc. v. FCC, *supra*, 261 F.2d at 65–67.

We will, then, give the Commission ninety days to conduct whatever further proceedings it may wish concerning the environmental and surcharge issues, to make additional determinations, and to serve, and file with us, a supplemental report consistent with this opinion and the record of any further proceedings. The parties shall serve and file any further briefs within fifteen days after service of the supplemental report; we will hear additional argument if requested. We emphasize the need for expeditious action and holding the Commission to a strict time schedule because we are permitting the December 13 order to stand and the Railroad to remain shut down.[19] In the meantime, we will retain

19. That this action to review the Commission's abandonment order has had to proceed with the Railroad already shut down and that we have now found it necessary to seek further agency consideration highlights the preferability of the Commission's usual practice of not making its orders of abandonment effective until 30 or 35 days after service. Indeed, the plaintiffs contend that on this ground alone the order was arbitrary, capricious, and an abuse of discretion. 5 U.S.C. § 706(2)(A). On the basis of the evidence before the Commission concerning the serious economic and physical condition of the Railroad we are not inclined so to conclude. Without doubt, immediate abandonment had a drastic effect on the users and employees of the Railroad. But all concerned had been on notice of the likelihood of abandonment for two and a half years. The Railroad had even offered the users the services of a transporta-

jurisdiction, cf. Addison v. Holly Hill Fruit Products, Inc., *supra,* 322 U.S. at 619, 64 S.Ct. 1215, and will withhold decision of the motion for a preliminary injunction. Upon the filing of the supplemental report and record we shall deal with this matter as on final hearing. F.R.Civ.P. 65(a) (2).

See also, D.C., 337 F.Supp. 170.

tion consultant to help them devise other means of transportation. Delay in the effectiveness of the order would have been of little significance here were it not now necessary to remand to the Commission for further action, and the matters which have delayed a speedy, final determination of the Railroad's future are ones which the plaintiffs could and should have presented to the hearing examiner long ago.