

**BLUE BIRD COACH LINES, INC.,**
**Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission,**
**Defendants,**

**and**

**M. I. Loker and Pauline Loker, d/b/a Seaway Coach Lines, Intervening Defendant.**

**No. 71 Civ. 139.**

United States District Court,
W. D. New York.

July 8, 1971.

Ronald W. Malin, Jamestown, N. Y., for plaintiff.

James F. Tao, U. S. Atty. (Fritz R. Kahn, Washington, D. C., of counsel), for defendant Interstate Commerce Commission.

H. Kenneth Schroeder, Jr., U. S. Atty. (Richard W. McLaren, Asst. Atty. Gen., and John H. D. Wigger, Atty., Dept. of Justice, of counsel), for defendant United States of America.

S. Harrison Kahn, Washington, D. C. (Lester H. Block, Buffalo, N. Y., of counsel), for M. I. Loker and Pauline Loker, d/b/a Seaway Coach Lines, intervening defendant.

Before FRIENDLY, Chief Circuit Judge, and HENDERSON and CURTIN, District Judges.

FRIENDLY, Chief Circuit Judge:

Blue Bird Coach Lines, Inc. (Blue Bird), into which Chautauqua Transit, Inc. (Chautauqua) has now been merged, here asks us to enjoin, suspend, annul, and set aside orders of the Interstate Commerce Commission approving the issuance of a certificate for bus transportation to M. I. Loker and Pauline Loker, a partnership doing business as Seaway Coach Lines (Seaway). Because of the Commission's refusal to accord Blue Bird and Chautauqua a fair opportunity to present evidence of the service they could offer under new authorizations granted by the Commission after the close of the hearings on Seaway's application but before the Examiner's recommended decision was handed down, and because of the effect this would have upon the public interest factors particularly relied on as calling for the grant of Seaway's authorization and upon the economics of Blue Bird's and Chautauqua's newly authorized operations, we remand for further consideration on a reopened record.

Before these proceedings began, Seaway was the holder of a bus certificate from Erie to Scranton, Pa. Its route lay south of the New York-Pennsylvania border, passing through such points as Corry, Warren, Bradford, Smethport, Port Allegany and Coudersport. Chautauqua held a certificate from Jamestown to Westfield, New York, on the shore of Lake Erie. Blue Bird held a certificate of an H type configuration. The bar was between Salamanca and Olean, New York; the lower left leg ran from Salamanca to a connection with Seaway's route at Bradford, Pa.; the lower right leg ran from Olean through Portville, New York, to Port Allegany, Pa.

These certificates left a good deal to be desired with respect to bus transportation between southwestern New York and northwestern Pennsylvania. The only service between Jamestown, New York and Erie, Pennsylvania was an indirect route operated by Chautauqua to Westfield, New York, where it connected with Greyhound's service between Buffalo and Erie. This lack of service affected not only Erie-Jamestown traffic but traffic between Erie and points in New York east of Jamestown, notably Salamanca and Olean, near which are St. Bonaventure University, with an attendance of 1200 to 1500 students and Christ the King Seminary with an attendance of 210 seminarians, since the only available services between Erie and such points were either the unsatisfactory service through Jamestown and a connection there with Hudson Transit Lines or a connection between Seaway and Blue Bird at Bradford, Pennsylvania.

■ Late in 1966 and early in 1967, all three companies filed applications for certificates which looked to remedy these deficiencies. On December 19, 1966,[1] Seaway applied for a route approximately 130 miles long between Erie and a connection with its existing route at Smethport, Pennsylvania. The new route left Erie over a highway to the north of Seaway's already authorized route, rejoined this near Corry, Pennsylvania, then turned north to cross the Pennsylvania-New York border, and proceeded through Clymer, New York, to a junction with Chautauqua's route at Lakewood. It paralleled Chautauqua for the three miles between Lakewood and Jamestown, New York, then proceeded east to Salamanca, New York, and substantially paralleled Blue Bird's route between Salamanca, Olean and Portville, New York, whence it crossed the boundary to rejoin the existing Seaway route at Smethport, Pennsylvania. Seaway's application also paralleled a route of Hudson Transit Lines, Inc. from Jamestown through Salamanca and Olean to a point approximately one mile south of Portville, whence Hudson's route continued to Corning, Elmira, and Binghamton, and thence to New York City.[2] The population of the principal points on Seaway's proposed route is shown in the margin.[3]

On December 27, 1966, allegedly without knowledge of Seaway's application and certainly before the latter was fully filed or published, Chautauqua applied for a thirty mile extension of its route, from a point northwest of Lakewood,

1. This was the date when the application reached the Commission. However, it was accompanied by a filing fee of only $50 (appropriate for a petition to modify a motor carrier permit) rather than the $200 required by the then recently adopted fee regulations to accompany an application for motor carrier authority, 326 I.C.C. 573, 591 (June 6, 1966). The filing date is of importance not so much on any issue of a few weeks priority in application as because of an amendment to § 208(c) of the Interstate Commerce Act, adopted Nov. 10, 1966, 80 Stat. 1521, whereby the automatic grant of charter rights would apply only to applications filed "on or before January 1, 1967." If Seaway's application was filed on or before January 1, 1967, issuance of the requested certificate would give it valuable charter rights from points such as Jamestown, Salamanca, St. Bonaventure and Olean, which it had never previously served; otherwise the need for such service in addition to that already provided by Blue Bird, Chautauqua, and Hudson Transit Lines would have to be shown. According to Seaway and the Commission, the Secretary of the Commission, on January 13, 1967, wrote Mr. Lund, Seaway's counsel in Erie, that an additional $150 was needed but that "your application will be held pending your remittance", which was promptly received. Blue Bird relies on testimony by Mr. Lund that this letter related to a different application filed by Seaway. It contends that the instant application and the accompanying $50 check were simply returned with a request for a $200 filing fee, and that the application and proper fee were trasnmitted after January 1, 1967. Copies of the Seaway-Commission correspondence as submitted by Blue Bird's attorney suggest that the January 13th letter did relate to the instant application (the "Sub 10" application). Even if Blue Bird were correct, it would still be within the power of the Commission, if it chose, to regard the Seaway application as filed before January 1, 1967, within the meaning of the 1966 amendment.

However Seaway's delay in making a completely proper filing and the consequent failure to publish its application in the Federal Register until February 16, 1967, dispel any inference that Chautauqua and Blue Bird did not seek authorization to improve their services until after they had learned of Seaway's application.

2. The Examiner inexplicably read a restriction in Hudson's certificate as preventing service between Jamestown and points on the Jamestown-Portville sector. This palpable error, which may well have affected his recommendation, was noted by Division 1, in the later proceedings described below, 110 M.C.C. 363, 370–71, n. 4. (1969).

3. Corry, Pa. 7,385
Clymer, N. Y. 500
Lakewood, N. Y. 3,814
Jamestown, N. Y. 39,222
Salamanca, N. Y. 7,802
Olean, N. Y. 19,072
Smethport, Pa. 1,725

New York to Erie, Pennsylvania. This would afford the same direct service between Erie and Jamestown which Seaway's application proffered—indeed by a slightly shorter route—and would afford a connection at Jamestown with Hudson's route to Salamanca, Olean and points east.

On February 13, 1967, also allegedly without knowledge of Seaway's application, Blue Bird applied for a thirty-two mile westward prolongation of the bar of its H type certificate from Salamanca to Jamestown. This would provide a second one-line service between Olean, St. Bonaventure, Salamanca and Jamestown, and, if Chautauqua's December 27, 1966 application was granted, a second two-line service between these points and Erie.

Good sense clearly called for consolidation of the hearing on these three applications, whether or not this was sought by any of the applicants [4] or required by Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945).[5] Instead each took its own course. Chautauqua's application was handled under the Commission's modified procedure, 49 C.F.R. §§ 1100.45–.54. Seaway opposed the application but the certificate issued on May 1, 1968. Blue Bird's application was heard, Seaway opposed it, but the certificate issued on April 8, 1968. Hearings on Seaway's application were held in May and November, 1967. Chautauqua and Blue Bird opposed.[6] A Blue Bird director testified that Blue Bird was capable of providing service on its pending route, that much of this would be duplicated by Seaway's application, and that if Seaway's application were granted, it would divert some of the traffic which Blue Bird anticipated on its pending application. Similarly, Chautauqua's President testified that its pending application for service between Jamestown and Erie would provide more convenient service between those two cities than Seaway's proposal. Since the service had not yet been approved, much less commenced, the protestants evidently thought the testimony they could develop on joint-line operations over the pending routes was limited, a view rather confirmed by the scant attention which the Examiner paid to what little there was.

The Examiner did not file his report, recommending approval of Seaway's application, until July 17, 1968. The most important evidence as to public convenience and necessity on which the Examiner relied concerned lack of adequate bus service in the area between Erie, on the one hand, and Jamestown, Salamanca, St. Bonaventure and Olean, on the other. There was also evidence with regard to the needs of the small towns of Corry and Clymer, and a smidgeon of testimony with respect to the desirability of service between points on Seaway's proposed new route and points between Smethport and Scranton, or beyond Scranton via the several carriers serving that point.[7] The Examiner's report took official notice of the new authorizations granted to Chautauqua and Blue Bird and acknowledged both that there would be duplications on certain route seg-

---

4. We were told at argument that Seaway sought this at some stage; apparently the issue was not pressed.

5. Since the Commission obviously did not conclude that the applications were mutually exclusive and in fact granted all three, none of the applicants is in the position of the *Ashbacker* plaintiff. For a discussion of the problems encountered in applying *Ashbacker* to transportation and citation of the important decisions, see 1 Davis, Administrative Law Treatise § 8.12 (1958), and the corresponding section of the 1970 supplement.

6. We are somewhat puzzled why the hearings were not before joint boards, as § 205(a) of the Interstate Commerce Act would seem to require. However, no one has made any point about this; perhaps the states waived this, see § 205(b).

7. Hudson's route afforded service between the Jamestown-Salamanca-Olean area and New York City and, by connections at such cities as Elmira and Binghamton, to many other points.

ments and that one witness had expressed a preference for the proposed Chautauqua schedule between Erie and Jamestown. He nevertheless concluded that Seaway's service would fill a transportation need and would not cause substantial harm to the existing routes and extensions of Blue Bird and Chautauqua. However, since the Seaway hearings had already closed, he did not make detailed findings on the effect that actual operation of the protestants' newly authorized service had on transportation needs or on the adequacy of the traffic to sustain what, in light of the approval already given to Chautauqua's application would be an alternative service between Erie and Jamestown, and a triplicating service, see note 2, between Jamestown, Salamanca, Olean and Portville.

On September 3, 1968, Blue Bird and Chautauqua filed exceptions, as did Hudson, and, more important, a petition for a further hearing to enable them to place in evidence the details of the joint operations they had already instituted. Under an order carrying a service date of November 8, Operating Rights Review Board No. 2 affirmed the report of the Examiner and denied the petition for a further hearing on the ground that no good cause appeared for granting one.

Blue Bird and Chautauqua then petitioned for reconsideration of both aspects of the order of the Review Board. On May 26 (service date June 10) 1969, Division 1 acting as an appellate division, reopened the proceeding for further consideration on the existing record. By decision dated August 29 (service date September 15), 1969, Division 1 reversed the Examiner's recommendation for award of a certificate, 110 M.C.C. 363. We quote the essentials of its reasoning in the margin.[8]

Seaway's petition to Division 1 for reconsideration having been denied, it asked the Commission to determine that the proceeding involved an issue of general transportation importance, a determination that would have resulted in re-

---

8. It has already been indicated that most of the service which applicants are here proposing to perform can be provided in joint-line operations by Chautauqua in combination with Blue Bird and by Blue Bird in combination with applicants, under their existing authority. It has not been established that these joint-line services would be unsatisfactory or inadequate to meet any public transportation needs which may exist in this respect; and accordingly, a grant of authority which would allow applicant to perform a single-line service which would be duplicative of Chautauqua's and Blue Bird's operations is not warranted. Compare Great Southern Coaches, Inc., Ext.-Little Rock, Ark., supra.

As to that limited portion of the proposed service which Chautauqua and Blue Bird or Blue Bird and applicants are not authorized to perform in combination with each other, or which Blue Bird and applicants could perform in joint-line operation but which travelers might find impractical to utilize because of the degree of circuity involved when compared with the proposed single-line operation, such as between Jamestown and Corry, we likewise conclude that the evidence of record does not afford a substantial basis for the authorization of a new service.

The testimony submitted in support of the passenger aspect of this portion of the proposed operation pertains only to service from and to Corry, Clymer, and North Clymer. Moreover, the public support for the latter service tendered by persons (i. e., the three residents of Corry, the resident of Clymer, and the resident of Jamestown) who constitute potential users thereof can only be characterized as insubstantial, and the record as a whole does not indicate that the traveling public would employ such service on other than a limited and infrequent basis. The evidence in this respect is not sufficient to warrant or consistent with the authorization of a regular-route motorbus service characterized by the performance of regular, scheduled operations. Furthermore, service from and to these points constitutes only a small part of the total operation which was contemplated by applicants, and it is questionable that it would be feasible for applicants to operate such a limited service, inasmuch as it is not indicated that these sparsely populated communities would produce a steady flow of outbound and inbound passenger traffic upon which a practicable, regular, scheduled motorbus service could be based.

view by the full Commission, 49 C.F.R. § 1100.101(a) (3–4). On February 9 (service date February 17), 1970, the Commission refused to make such a determination but, in seeming conflict with its own Rule 101(a) (3), nevertheless ordered that the proceeding be again reopened for reconsideration by it on the existing record.

Meanwhile another development had been occurring. On April 29, 1970, Chautauqua and Blue Bird filed an application for approval of a merger. Apparently this was not opposed, and on August 18, 1970, the Commission granted it, effective on the service date, August 27, 1970.[9]

On August 24 (service date September 4), 1970, the full Commission, over three dissents, vacated the order of Division 1 and adopted the recommendation of the Examiner, 112 M.C.C. 64 (1970). While approving the Division's taking official notice of Blue Bird's and Chautauqua's new authorizations, it said the Commission "may not properly presume, in the absence of proof, that a carrier is providing, or will provide, a complete and satisfactory service under such authority," and also should not "consider the evidence adduced in another proceeding to supplant this deficiency."[10] Hence "the Appellate Division's finding as to lack of need for the proposed service, essentially predicated on the mere existence of protestant's combined authority without persuasive evidence of the quality and character thereof, was inappropriate." 112 M.C.C. at 68. Also "the proposed service, being a single-line through service, would be clearly more convenient to the needs of the traveling public, more inherently efficient than a joint-line service * * *", and Seaway's route between Jamestown and Erie differed from Chautauqua's, 112 M.C.C. at 69.[11]

Blue Bird and Chautauqua promptly petitioned for reconsideration and further hearing. They pointed out that they had long since requested an opportunity to give the Commission the very information for the lack of which they were now being faulted but had been denied that privilege by Operating Rights Review Board No. 2 in November, 1968. They stated that at such a hearing they would show their present schedules offered two convenient daily trips each way between Erie, Jamestown and Olean, and that they could furnish such service without the need for a bus change, even apart from the merger whose approval by the New York Public Service Commission was being awaited. The Commission denied this. After further motions unnecessary to detail, this action followed. Chief Judge Henderson entered a temporary restraining order which, with Seaway's consent, has been allowed to remain in effect pending our decision.

■ Characterizing plaintiff's argument as a plea that an already certificated carrier "should be given an opportunity to perform before new service is authorized," the United States and the Commission say "that precise issue was decided adversely to plaintiff in United States v. Dixie Highway Express, 389 U.S. 409, 88 S.Ct. 539, 19 L.Ed.2d 639 (1967)", as well as in Edwards Motor Transit Co. v. United States, 201 F.Supp. 918, 922 (M.D.Pa.1962) and Campus

---

9. The merger was consummated January 13, 1971, by the filing of a certificate of merger, approved by the New York Public Service Commission, with the New York Secretary of State.

10. This view, as applied to cases where the applicant had appeared in the other proceeding and can show no prejudice from the consideration of evidence adduced therein, seems at variance with United States v. Pierce Auto Freight Lines, Inc.,

327 U.S. 515, 528, 66 S.Ct. 687, 90 L.Ed. 821 (1946).

11. The difference was primarily the inclusion of Corry, Pa., with a population of 7,385, and of Clymer, N. Y., with a population of 500. The Commission did not consider whether any needs of these communities could not be adequately met by granting Seaway's application only for the Erie-Jamestown segment, see § 207 (a).

Travel, Inc. v. United States, 224 F.Supp. 146 (S.D.N.Y.1963). If this were the extent of plaintiff's argument, we should dismiss the complaint out of hand. When carriers authorized to render service have failed to meet the transportation needs of their service area without valid excuse, it would be intolerable to allow them to defeat a new application merely by offering to improve, or indeed actually improving, their service during the hearing, much less after it. Any such rule would discourage the making of new applications and thereby condemn the public to continuation of the ineffective service which had stimulated them. As three-judge courts in *Dixie Highway Express* had twice laid down precisely such a rule, 242 F.Supp. 1016, 1021 (S.D.Miss.1965), 268 F.Supp. 239, 241 (S.D.Miss.1967),[12] it is little wonder that the Supreme Court reversed in unmeasured terms, 389 U.S. 409, 88 S. Ct. 539, 19 L.Ed.2d 639 (1967).

■ Since both Blue Bird and Chautauqua applied for the route extensions before learning of Seaway's application, their improved services are not just a response to Seaway's filing. And they are not asking us to depart from *Dixie Express*. Their argument is quite different: The Commission has issued Seaway a certificate paralleling about 78 miles of plaintiff's certificated route and offering an alternative for another 45 or 50 miles through a thinly populated territory, and affording only insignificant service which plaintiff cannot render, largely on the basis that plaintiff offered no proof of what it was doing under authorizations granted after the hearings had ended but while the case was still pending before the Examiner. Yet the Operating Rights Review Board had refused to grant the timely request of Blue Bird and Chautauqua, on September 3, 1968, to submit precisely such

proof. While the effect of this error was temporarily neutralized by Division 1's reversal of the Examiner, it fatally infected the action of the full Commission two years later. The certificates the Commission had granted Blue Bird and Chautauqua in April and May 1968 imposed upon them a duty not only to establish effective service on the routes authorized but, within the limits of feasibility, effective connecting service as well, and to acquire equipment needed for these purposes. There was not a word in the record to show they had not done so; to the contrary, two years before the Commission's decision, the two carriers had offered to prove they had done exactly that. The course taken by the Commission is not consistent with our notions of fair procedure or with the spirit of 5 U.S.C. § 554(c).

We are fully aware of the statement made for the Supreme Court by Jamestown's most distinguished citizen, Mr. Justice Jackson, in I.C.C. v. Jersey City, 322 U.S. 503, 514–515, 64 S.Ct. 1129, 1134, 88 L.Ed. 1420 (1944):

> Administrative consideration of evidence—particularly where the evidence is taken by an examiner, his report submitted to the parties, and a hearing held on their exceptions to it—always creates a gap between the time the record is closed and the time the administrative decision is promulgated. This is especially true if the issues are difficult, the evidence intricate, and the consideration of the case deliberate and careful. If upon the coming down of the order litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not

12. The second opinion of the district court stated that "The invariable rule of the Commission is and has been for a long time that no certificate affecting the area of another carrier will be issued until that other carrier has been furnished an op-

portunity either to improve or correct his service to such route or decide whether he wishes to or can furnish the added service sought by the applicant carrier." 268 F.Supp. at 241.

be subject to reopening. It has been almost a rule of necessity that rehearings were not matters of right, but were pleas to discretion. And likewise it has been considered that the discretion to be invoked was that of the body making the order, and not that of a reviewing body.

But this language must be read in the light of the wholly different circumstances of that case. The claim there was that, although the Commission had granted a petition for reconsideration of an order permitting increased rates "out of an abundance of caution," this had been done only on a limited basis and the Commission had refused to consider more recent financial data, which was not within the scope of the reconsideration directed and which was similar in nature to evidence earlier found to have been without probative value. Since the financial condition of carriers constantly fluctuates, if every rate order were subject to reconsideration in the light of post-hearing changes, none would ever become final. If the change proves sufficiently important and enduring, the rate can always be altered. Not only is a certificate a different matter, but here the Commission had created the problem itself, by failing to order a comparative hearing in the first instance, issuing certificates to Blue Bird and Chautauqua which gave them new rights and imposed new responsibilities, refusing through its Operations Review Board to grant their timely requests to show how operations under the new authorizations had affected the area's transportation needs, and then issuing a certificate to Seaway because of the absence of evidence which the protestants could not effectively have submitted during the hearing and which the Commission had refused to allow them to submit thereafter. While United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 535, 66 S.Ct. 687, 90 L.Ed. 821 (1946), and Northern Lines Merger Cases, 396 U.S. 491, 520–522, 90 S.Ct. 708, 24 L.Ed.2d 700 (1970), referred to the *Jersey City* opinion with approval, both make clear that the last sentence in our quotation from it does not mean that a reviewing court may not remand for a refusal to reopen when the wide discretion accorded an agency has been abused.[13]

It may be, of course, that after considering the operations conducted by Chautauqua and Blue Bird (now merged to become Blue Bird alone), the Commission will decide that Seaway's service is needed, because Blue Bird's and Hudson's services are inadequate, because still further competition is justified, or because of the service for Corry, Pennsylvania, and Clymer, New York, which Seaway alone can provide, but see n. 11, and between Jamestown, Salamanca and Olean on the one hand and points on Seaway's route between Smethport and Scranton which only Seaway can afford on a one-carrier basis. Whether there would be substantial evidence to support such a determination is not before us now. We hold only that, on the special facts of this case, the Commission abused its discretion in donning "such complete blinders" United States v. Pierce Auto Freight Lines, Inc., *supra*, 327 U.S. at 529, 66 S.Ct. 687, to a new situation that it had itself created.

The order granting the certificate is vacated and the cause remanded to the Commission, with instructions promptly to take further proceedings not inconsistent with this opinion.

13. If it can be said that a remand is unfair to Seaway since it should have had an opportunity to demonstrate that, with its proposal granted, Chautauqua's and Blue Bird's ought to have been denied, the answer is that Seaway failed to press the point that the new authorizations to Chautauqua and Blue Bird should be withheld until its own application had been decided, whereas Blue Bird has vigorously asserted its rights.