HUDSON RIVER FISHERMEN'S ASSO-CIATION, and Scenic Hudson Preservation Conference, Petitioners,

v.

FEDERAL POWER COMMISSION, Respondent,

Consolidated Edison Company of New York, Inc., Intervenor.

Nos. 859, 860, Dockets 73–2258, 73–2259.

United States Court of Appeals, Second Circuit.

Argued Feb. 11, 1974.

Decided May 8, 1974.

Rehearings Denied July 1, 1974.

---

Albert K. Butzel, New York City, (Berle, Butzel & Kass and Peter Millock, New York City, on the brief), for Scenic Hudson Preservation Conference.

Angus Macbeth, New York City (Sarah Chasis, New York City, and Ronald J. Wilson, Washington, D. C., on the brief), for Hudson River Fishermen's Ass'n.

William M. Sawyer, Washington, D. C. (Leo E. Forquer, Gen. Counsel, and George W. McHenry, Jr., Solicitor, Washington, D. C., on the brief), for Federal Power Comm.

Carl D. Hobelman, New York City (LeBoeuf, Lamb, Leiby & MacRae, G. S. Peter Bergen, and Andrew Gansberg, New York City, on the brief), for Consolidated Edison Co. of New York, Inc.

Before ANDERSON, MANSFIELD and OAKES, Circuit Judges.

ROBERT P. ANDERSON, Circuit Judge:

In Scenic Hudson Preservation Conference v. Federal Power Commission, 354 F.2d 608 (2 Cir. 1965), cert. denied, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966), hereinafter cited as *Scenic Hudson I,* this court vacated the Federal Power Commission's grant of a license to Consolidated Edison Company of New York, Inc., for construction of a hydroelectric pump-storage plant[1] on Storm King Mountain in Cornwall, New York. The determinative reason underlying the decision was that the Commission had failed fully to comply with 16 U.S.C. § 803(a) in that it neither considered alternative sources of power nor did it resolve the crucial issue of whether the project was "best adapted to a comprehensive plan for improving or developing a waterway" with minimal disruption of the environment. The Commission was ordered to investigate "among other matters, costs, public convenience and necessity, and absence of reasonable alternatives," as well as the potential

---

1. Within the next year, Consolidated Edison expects to begin construction of the hydroelectric plant to pump water from the Hudson River to a reservoir to be located on the top of Storm King mountain. By storing water in the reservoir during seasons or hours of low electrical consumption, when power is likely to be less expensive, and by allowing water to flow from the reservoir during times of peak consumption, when electricity may be more highly priced, the plant is designed to equalize the demand for electricity, and, thus, reduce the chance of brown-outs due to overloads. By being able quickly to draw on a huge reserve of electrical generating power, the plant may also be helpful in offsetting dramatic electrical imbalances, such as the one which caused the 1965 blackout.

danger to fish "before deciding whether the Storm King project [was] to be licensed."[2] 354 F.2d 624–625.

During the next six years the Commission gave detailed and comprehensive consideration to alternatives and rejected a gas turbine plant as a means of providing reserve power because of prohibitive operating costs, frequency of breakdowns and the lengthy turbine starting time. Interconnections with other electrical systems were also rejected because they could not provide sufficient power and because the connections might be terminated during emergencies.

In addition Consolidated Edison sponsored a Policy Committee [3] to determine the extent to which the plant operation would deplete fish population. The Policy Committee's report, entitled "Hudson River Fisheries Investigation 1965–68", hereinafter referred to as Study Report, declared that the evidence indicated there would not be any significant adverse effect on the striped bass. Although the Committee estimated that one percent of all eggs in the River, three percent of all larvae, and over six percent of the young-of-the-year fish would be destroyed by the plant in one year of operation,[4] it concluded that

these percentages were "negligible when related to the total population of the species in the Hudson river." The Study Report stated, however, that additional tests would be necessary and that "if these suggested studies indicate adverse effects not established in pre-constuction surveys the plant operation schedules should be modified to produce minimal effects on fish populations."

The Study Report was not issued until after the hearings concluded and the Policy Committee was, therefore, never subjected to cross-examination. Nonetheless, the Commission relied heavily on the report in affirming the Trial Examiner's finding that the project posed no threat to fish. Consolidated Edison Company of New York, Inc., Federal Power Commission Opinion and Order Issuing License (1970). The Commission adopted the Policy Committee's proposal for future studies, and, in Article 36 of the license, ordered Consolidated Edison to engage in a continuing study of the plant's potential impact on the fish in the River. The Commission reserved the power under Article 15 to order Consolidated Edison to "coordinate the operation of the project" to protect "beneficial uses of water resources" and under Article 16 to order Consolidated Edison

2. The fisheries question largely concerned the potential danger to the Hudson River striped bass, Rocus saxatillis, which spawn in an 80-mile span of the River extending from Croton, 20 miles below the plant site, to Coxsackie, 60 miles north of Cornwall. This area and the Chesapeake Bay are the major spawning locations for the striped bass in the North-Atlantic states, and the commercial value of the yearly catch spawned in the Hudson River alone has been estimated by an Atomic Energy Commission Safety and Licensing Board to range from $4 million to $16 million. In the Matter of Consolidated Edison of New York, Inc., Atomic Safety and Licensing Board, September 15, 1973.

Twenty-six other species of fish spawn in the Hudson River, and some of these, notably the white perch and shad, are also likely to be affected by plant operations. It is presumed for purposes of this opinion and the resulting order that the appropriate agencies should exercise the same concern for other species as for the striped bass.

3. The Policy Committee was composed of representatives from the New York Conservation Department, the New Jersey Division of Fish and Game, and the United States Bureau of Sports, Fishing and Wildlife.

4. Between early May and the middle of June, the bass eggs are laid and hatch into larvae which, after a week of development, are capable of some swimming; nevertheless, both eggs and larvae tend to drift with the flow of the River. No screening device has yet been invented which can keep eggs or larvae out of a hydroelectric system without significantly damaging them. If they are drawn into the system, a substantial number of eggs and an even more substantial number of the extremely delicate larvae will be destroyed by turbulence, abrasion, and heat. By late June, most larvae have grown to an inch and a half long, and can be screened from the intake; nevertheless, many of these young-of-the-year fish can be expected to elude screens and enter the plant.

"for the conservation, and development of fish and wildlife resources" to construct or modify such facilities or operations as the Commission might order.

In affirming the issuance of the license in Scenic Hudson Preservation Conference v. Federal Power Commission, 453 F.2d 463 (2 Cir. 1971), cert. denied, 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972), hereinafter cited as *Scenic Hudson II*, this court relied primarily on the Study Report in finding that there was substantial evidence to support the Commission's conclusion that fish were not endangered, 453 F.2d at 476. But it has meanwhile become apparent that the Policy Committee assumed, for purposes of its projections, that the Hudson River flows only downstream, and consequently it apparently calculated the fish mortality rate on the assumption that the eggs and larvae would only be exposed to the plant intake once. The River, however, is a tidal estuary and the water flows north on the flood and south on the ebb, changing direction four times each day. A given number of eggs or larvae, therefore, might be exposed to the plant four times in the course of a 24-hour day rather than just once on their way to the sea. Further, the Policy Committee calculated the speed of the River as the average of the downstream flow which included both the rates of the ebbing tides and the natural drift of the River during the same period. But the actual rate of speed of a given hatch of larvae is far less than the maximum downstream flow because they are pushed upstream again by the flooding tide. Therefore, the eggs and larvae do not pass the plant as quickly as the Committee estimated, and the chances for a given set of eggs or larvae to enter the plant increase accordingly.

The potential impact of the Committee's failure to assess the effect of the tidal flow was not evident until 1972–73 when the Atomic Energy Commission held hearings on Consolidated Edison's license to operate the nuclear power plant at Indian Point, a few miles south of Cornwall. Using the Study Report data, but correcting the Policy Committee's assumptions, the AEC staff concluded that the Indian Point plant alone would reduce a black bass generation from 14 to 43 percent. In the Matter of Consolidated Edison of New York, Inc., Atomic Safety and Licensing Board, September 14, 1973. As a result, the Board conditioned its grant of a license upon the installation, not later than January 1, 1978, of a closed-cycle cooling system. According to a statement of Consolidated Edison's counsel upon oral argument the Board may consent to the substitution of other suitable methods for fish protection. The Indian Point facilities utilized half the amount of water as that of Storm King, and consequently the loss of bass at Storm King could be substantially greater than the AEC projections.

On February 2, 1973, the Hudson River Fishermen's Association (HRFA), a group of commercial and sports fishermen petitioned the Commission, pursuant to 16 U.S.C. § 803, to determine the feasibility of taking no water into the reservoir during the 49-day spawning period in May and June. The HRFA did not request a complete hearing but asked the Commission to exercise the power reserved under Articles 15 and 16 of the license to consider modification of plant operations for the protection of fish.

On March 29, 1973, the Scenic Hudson Preservation Conference, a coalition of individuals and groups interested in protecting the beauty and resources of the River valley, also petitioned, pursuant to 16 U.S.C. §§ 797 and 803, for complete reconsideration of the license based on the newly discovered danger to fish, the increased capital cost of the project, and the New York utilities' working agreement which no longer requires the amount of reserve power that the Storm King project was designed to provide.

The FPC dismissed both petitions, stating that all the issues had been previously decided. With regard to the danger to fish, the FPC said the Trial

Examiner had been aware of the tidal effects of the River, and that the evidence presented consisted of "no new basic data but only differences of opinion and interpretation by professional biologists in connection with matters already in the record." Consolidated Edison of New York, Inc., Project No. 2338, Order Denying Petition to Reopen and· For Further Hearings, Federal Power Commission (May 31, 1973).

While Scenic Hudson's petition, based on increased costs and decreased power requirements, was denied with prejudice, the petitions concerning fish conservation were denied without prejudice to allow renewal after Consolidated Edison's studies relating to fish spawning are completed. Consolidated Edison of New York, Inc., Project No. 2338, Order Denying Application for Rehearing, Federal Power Commission (July 26, 1973).

The Commission relies on two principles of administrative law in arguing that a reopening of these proceedings would be improper. First, it contends that it has unreviewable discretion on this issue; and, second, it states that all of the questions raised have been finally decided and are, therefore, barred from reconsideration under the Federal Power Commission Act, 16 U.S.C. § 825.

Agencies must have the power to protect themselves from "interminable delay" brought about by repeated updatings of the evidence, whether cost increases or amendments to working agreements. United States v. Interstate Commerce Commission, 396 U.S. 491, 522, 90 S.Ct. 708, 24 L.Ed.2d 700 (1970). And a party in interest, such as Consolidated Edison, should not be forced to justify again and again in terms of costs and benefits the means which it has chosen to supply electrical energy during peak hours and emergencies. See Appalachian Power Co. v. Environmental Protection Agency, 477 F.2d 495 (4 Cir. 1973).

For these reasons, courts are reluctant to order administrative agencies to reopen and the Supreme Court has done so only once in Atchison, Topeka & Santa Fe Railway Co. v. United States, 284 U. S. 248, 52 S.Ct. 146, 76 L.Ed. 273 (1932), a rates reduction case that has been limited to its facts. United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 534, 66 S.Ct. 687, 90 L.Ed. 821 (1946). "It has been almost a rule of necessity that rehearings were not matters of right, but were pleas to discretion. And likewise it has been considered that the discretion to be invoked was that of the body making the order, and not that of a reviewing body." Interstate Commerce Commission v. City of Jersey City, 322 U.S. 503, 514–515, 64 S.Ct. 1129, 1134, 88 L.Ed. 1420 (1944). Braswell Motor Freight Lines, Inc. v. United States, 275 F.Supp. 98 (W.D. Tenn.1967), aff'd per curiam, 389 U.S. 569, 88 S.Ct. 692, 19 L.Ed.2d 779 (1968).

■ The petition to review the Commission's order denying Scenic Hudson's petition to reopen for further study of alternative means of generating electricity is, therefore, dismissed, without prejudice, however, to its renewal if the Commission has not affirmatively found fish protection and preservation adequate by January 1, 1975.

■ Reconsideration of fish conservation, however, does not impose on either the Commission or the utility the burdens of a reopening. The Commission, pursuant to Articles 15, 16 and 36 of the license, has assumed "continuing jurisdiction" over the issue, see 2 Davis, Administrative Law Treatise § 18.09, and will presumably conduct further investigations in this area. Furthermore, Consolidated Edison has committed itself under Article 36 to continue studies of this same issue, and it will not be prejudiced because it is asked to correct promptly a probably incorrect report previously submitted to the court.

■■ If an administrative ·agency's refusal to take new evidence clearly subverts the public interest, Brennan v. Occupational, Safety and Health Review Commission, 492 F.2d 1027, 1031–1032

(2 Cir. 1974); WMOZ, Inc. v. Federal Communications Commission, 120 U.S. App.D.C. 103, 344 F.2d 197 (1965), courts have the power to order further hearings. The Commission has a statutory duty to protect recreational and commercial uses of waterways, Namekagon Hydro Company v. Federal Power Commission, 216 F.2d 509 (7. Cir. 1954), and the Supreme Court has emphasized that the FPC must develop an adequate record concerning spawning activities of anadromous fish. Udall v. Federal Power Commission, 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967).

When the Commission denied the present petitions for hearings, it was not operating in a vacuum, but was refusing to correct an apparent error in a report ordered by and previously relied upon by this court. Under these circumstances the Agency's exercise of discretion must be reviewable and "[w]here, as here, a regulatory agency has ignored factors which are relevant to the public interest," as defined by this court in its prior decisions, "the scope of judicial review is sufficiently broad to order their consideration." Michigan Consolidated Gas Co. v. Federal Power Commission, 283 F.2d 204, 226 (D.C.Cir.), cert. den. 364 U.S. 913, 81 S.Ct. 276, 5 L.Ed.2d 227 (1960). *See also* Ng Yip Yee v. Barber, 267 F.2d 206, 208 (9 Cir. 1959); Morand Brothers Beverage Co. v. NLRB, 204 F.2d 529 (7 Cir.) cert. den. 346 U.S. 909, 74 S.Ct. 241, 98 L.Ed. 407 (1953), reh. den. 346 U.S. 940, 74 S.Ct. 376, 98 L.Ed. 428 (1954).

If, after adequate hearings and expert consideration, the Commission had decided that conclusions reached in the Study Report were correct, this court would be bound by that finding, if supported by substantial evidence, but the petitioners have demonstrated such a grave probability of error that the Commission cannot excuse itself from its obligation under *Scenic Hudson I* by simply submitting an unsworn statement in a letter [5] from one of the authors of the disputed report as ample evidence to rebut the claimed inaccuracy.

By "donning . . . 'complete blinders' . . . to a new situation," Blue Bird Coach Lines, Inc. v. United States, 328 F.Supp. 1331, 1338 (W.D.N. Y.1971), the FPC has abused its discretion.[6]

■ The Commission contends, however, that under 16 U.S.C. § 825*l*(b),[7] this court finally decided all questions raised in *Scenic Hudson II* and, therefore, is now barred from ordering further hearings. "Finality," in the context of administrative proceedings, usually precludes reconsideration of adjudicative facts which, with due diligence on the part of petitioners, could have been litigated in the previous proceeding. 2 Davis, Administrative Law Treatise § 18.02 (1958). Nothing in § 825*l*(b) suggests that Congress intended to broaden the meaning of "finality" to foreclose correction of egregious errors resulting from evidence which could not, even with due diligence, have been sub-

---

5. To refute the claim that there is an error in the record, the Commission and Consolidated Edison rely on a letter from Policy Committee Chairman Hall stating that "the most critical evaluation of the potential effect" on fish life is projected in the Study Report. In light of the AEC Safety and Licensing Board's conclusion that the plant could kill ten times as many fish as estimated in the Study Report and the obvious fact that in a slow, alternating river flow, a given number of eggs or larvae is more likely to be removed than in a fast, downstream flow, this claim is unpersuasive.

6. The Assistant Secretary of the Interior has urged the Commission "to give a full and complete review of the effects . . . of the Cornwall project . . . on the Hudson fishery" in light of the AEC staff's findings. Although this is not a request for a plant modification within the meaning of Article 16, the Commission was asked to use its informed discretion in reviewing the petitioners' requests.

7. This section in pertinent part provides:
". . . the judgment and decree. of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final . . . ."

ject to cross-examination. On the contrary, the section provides that the court may consider objections not raised before the Commission and order the taking of additional evidence upon a showing that there were reasonable grounds for failure to raise such claims. While this exception applies only to cases on direct appeal, it evinces Congress' intent to assure that there is a chance to be heard on all relevant issues.

"When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose," United States v. Utah Construction & Mining Co., 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966), but there has not been "an adequate opportunity to litigate" the fish conservation issue because the disputed Study Report was presented to the Commission after the hearings were closed, and the potential impact of the flaw in the report was not evident until the data on which it was based were subjected to analysis by the AEC after this court had approved the grant of the license.

Moreover, the finality provision of § 825*l*(b) does not apply to a request for an evidentiary hearing pursuant to a provision in a license. This section was intended by Congress to prevent postponement of construction through repetitive and unnecessary inquiries, but where the Commission has already ordered further evidence to be compiled, there is no frustration of congressional intent by ordering a remand to consider that evidence promptly.

The Commission contends that the fish conservation issue was "adequately litigated" before the Trial Examiner who decided before the issuance of the Study Report that the plant posed no threat to fish. But the Examiner noted "the absence of usable data" concerning the danger to fish and, in his report deferred to some of the Study Report's statistics. Consolidated Edison of New York, Inc., Presiding Examiner's Initial Decision, (August 6, 1968) 101, 102. The Commission, itself, has termed the Study Report "a most comprehensive study of the problem and as definitive a development of the issues raised by the court as is ever likely to be achieved within the realm of practicality." Consolidated Edison Co. of New York, Inc., supra, Opinion and Order Issuing License, 59. It cannot now fall back on a factual record which the Examiner admitted was inadequate.

Both the Commission and Consolidated Edison state that the tidal assumption in the Study Report have been called to the attention of the New York Court of Appeals in de Rham v. Diamond, 32 N.Y.2d 34, 343 N.Y.S.2d 84, 295 N.E.2d 763 (Crt. of App. 1973), and that the New York court's holding that the record indicates no substantial danger to fish should be *res judicata*. The State court, however, was reviewing the record compiled by the State Commission of Environmental Conservation to assure the State that New York's water quality standards were not contravened. It was not enforcing the Federal Power Commission Act, nor was it in a position to enforce the mandate of *Scenic Hudson I.* Its decision, furthermore, was issued six months prior to the publication of the findings by the AEC staff. "Courts often assert a reluctance to hold that a public interest is estopped by res judicata," 2 Davis, Administrative Law Treatise § 18.03, and "a determination under one statute is not binding when the same question arises under another statute," Id. § 18.04, especially where the question is presented to a different forum in a different factual context. See Grose v. Cohen, 406 F.2d 823, 825 (4 Cir. 1969); Old Dutch Farms, Inc. v. Milk Drivers and Dairy Employees Local Union No. 584, 281 F.Supp. 971, 974 (E.D.N.Y.1968).

The HRFA has only requested a hearing, pursuant to the license, to consider closing the plant intake system during spawning season. The Scenic Hudson Preservation Conference, however, con-

tends that the fisheries issue alone requires a complete reconsideration of the license because the plant cannot be operated in any event without endangering the striped bass. Consolidated Edison informed the court at oral argument that it believes the plant can operate effectively, absent emergencies, without withdrawing water from the Hudson during spawning season. The mandate of *Scenic Hudson I* can, therefore, be met without a complete reopening of the licensing proceeding, but if the Commission concludes that the plant's operation cannot be curtailed during spawning season or that emergency use during that time would still pose a major threat to the fish, a reopening of the entire licensing proceeding may be necessary.

■ The Commission says that these hearings should not be held now but should await Consolidated Edison's initial reports on its study of spawning under Article 36. Environmental issues, however, should be considered early in the life of a project to insure that construction or operating changes will conform to environmental requirements. Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1128 (1971). The environmental groups, who have so assiduously prosecuted this appeal, should not be faced with the *fait accompli* of an operating plant before any modifications are considered.

The Commission's order refusing to hear the petition of the Hudson River Fishermen's Association is vacated, and that issue is remanded for immediate hearings pursuant to Articles 15, 16, and 36 of the license.

## ON PETITIONS FOR REHEARING

### PER CURIAM:

In its petition for rehearing Consolidated Edison of New York Inc. states, in effect, that the latest decision of this court has confronted it with an impossible choice. It says that § 13 of the Federal Power Commission Act, 16 U.S.C. § 806, requires commencement of construction within two years of the award of a license and limits extensions of this period to two additional years; and that, due in large part to litigation, the Storm King project has already been granted the two-year extension. It asserts that if it is required by economic considerations or by the Federal Power Commission to cease construction pending reconsideration of the fish conservation issue in compliance with this court's mandate, it will be foreclosed from this project under the time limits of the statute.

■ The strictures which it mentions, however, are not as inflexible or stringent as Consolidated Edison assumes. It has already commenced construction within the plain meaning of the statute; and, after construction begins, "the period for the completion of construction carried on in good faith and with reasonable diligence may be extended by the commission when not incompatible with the public interest." 16 U.S.C. § 806. It is hardly conceivable that the Commission would not conclude that a delay for purposes of complying with the mandate of this court is in good faith and compatible with the public interest.

■ The petitions for rehearings submitted by both Consolidated Edison and the Scenic Hudson Preservation Conference reveal some confusion regarding the further proceedings required by this court. The hearings pursuant to the license should deal with the extent to which the plant poses a danger to fish life and whether such danger can, as a practical matter, be eliminated or greatly minimized. If the danger is found to be greater than previously predicted and if the plant or plant operations cannot be altered effectively to remove or substantially prevent this danger, then the Commission must decide whether to reopen completely the licensing proceedings to determine whether the benefits to be provided by this plant outweigh its costs in terms of danger to fish life. Such a reopening will also be required if Consolidated Edison or the Commission fails to make a good faith effort to comply

with the deadline set by this court for the completion of the hearings.

Consolidated Edison's petition for rehearing and Scenic Hudson Preservation Conference's motion for stay of construction and its petition for rehearing are denied.